[No. G012606. Fourth Dist., Div. Three. July 29, 1994.]

CYNTHIA DIANE LEE, Plaintiff and Appellant, v.
BANK OF AMERICA NATIONAL TRUST AND SAVINGS
ASSOCIATION, Defendant and Respondent.

**COUNSEL**

James R. Goff for Plaintiff and Appellant.

Payne & Fears, Daniel F. Fears, Timothy M. Freudenberger, Linda B. Reed, Michael B. Tannatt, Frank G. Ker, Ullar Vitsut and Michael J. Halloran for Defendant and Respondent.

**OPINION**

**SILLS, P. J.**—The real issue in this case is whether a person may be sued for something he or she has not yet done.

I

Here are the facts.[1] In 1988 Cynthia Diane Lee was the manager of branch operations at a Bank of America branch in Costa Mesa. She complained to her supervisor about various safety hazards at the branch, including exposed electrical wiring, broken metal cabinets with jagged edges, teller carts with broken wheels, loose lighting fixtures, chairs with broken casters and exposed nails and tacks, a broken stairway rail, lack of adequate drinking water and torn stair floor. She also complained to her supervisor's superiors that he had failed to release funds to a marshall who was executing a lien.

On March 14, 1988, Lee was demoted. She was given a memo stating she would be given "a position of less managerial responsibility in another office." Her salary was to be reduced by $200 per month. The supervisor allegedly told Lee that the demotion would be effective March 22, 1988.

After the demotion, Lee suffered a "stress/anxiety attack" allegedly as the result of her "employment situation." She was then placed on extended

---

[1]Statements in our rendition of facts which are not specifically connected to allegations in either the original or first amended complaint are taken from Lee's deposition which was submitted in support of the bank's motion for summary judgment.

medical leave until January 1989, when her doctor allowed her to return to work. When Lee returned she was offered a position as an assistant manager of branch operations at a branch in Laguna Beach, which she rejected in part because it still represented a demotion. She ended up in "staff available," i.e., waiting assignment.

On March 17, 1989—a little more (or a little less) than a year after her demotion—Lee, representing herself, filed a complaint against Bank of America. While denominated "wrongful termination," the complaint made no allegations of actual termination of employment. The theory of the complaint was that after Lee had "conveyed to her superiors . . . information she observed of illegal wrongdoing" which she "reasonably believed to be a violation of public policy," she was demoted in retaliation for it. Though she styled it a "demotion and/or forced resignation," she was in fact still an employee of the bank at the time of filing. Lee was fired on April 28, 1989—more than a month *after* she filed suit.

Two years went by. Eventually, on April 30, 1991, she filed a first amended complaint for wrongful termination. All causes of action in this document were based on the April 1989 termination.[2]

Bank of America answered the first amended complaint in June 1991, and, six months later, brought a motion for summary judgment based on, among other things, the running of the statute of limitations after the expiration of two years from the date of the actual termination. The trial court granted the motion; Lee has appealed from the ensuing judgment of dismissal.[3] She has not made any effort to show that her causes of action in the first amended complaint are not subject to either the one-year statute for personal injuries (Code Civ. Proc., § 340, subd. (3)) or the two-year statute for breaches of oral contracts. (Code Civ. Proc., § 339, subd. 1.) The crux of the case is whether her amended complaint "relates back" to her earlier one.

## II

The closest case on point is *Honig* v. *Financial Corp. of America* (1992) 6 Cal.App.4th 960 [7 Cal.Rptr.2d 922]. In *Honig* a savings and loan executive

---

[2]While the complaint alleged the termination occurred on April 29, 1989, she admitted at her deposition that she was terminated on April 28, 1989.

[3]On March 23, 1992, a formal order granting summary judgment was filed. On May 21, 1992, Lee filed her notice of appeal from "the judgment entered on or about March 23, 1992." It is clear that the March 23 order functions as a final judgment and was considered as such by Lee. We too treat the document as the final judgment it was obviously meant to be. (See *Francis* v. *Dun & Bradstreet, Inc.* (1992) 3 Cal.App.4th 535, 539 [4 Cal.Rptr.2d 361].)

filed a complaint *while still employed* by the institution. He alleged a "campaign of harassment, threats, humiliation, debasement and intimidation" in retaliation for his objection to being forced to misrepresent the nature of the certificates of deposit he was selling. The executive feared his discharge was imminent and filed suit as a "preventative measure." (6 Cal.App.4th at p. 963.)[4]

After the complaint was filed, the executive was summoned before a meeting of the savings and loan's ethics committee. He requested his counsel be present. The request was refused. He then refused to discuss the pending lawsuit. He contended he was the object of " 'trumped up' " charges. He was fired for insubordination. (6 Cal.App.4th at p. 693).

More than two and one-half years after the original complaint was filed, the savings and loan filed a summary judgment motion. The executive opposed the motion and filed his own motion to amend the complaint to include additional paragraphs relating to the events leading up to the discharge. Further, the proposed complaint added a cause of action for defamation "based upon spreading to others the reason for the discharge." (6 Cal.App.4th at pp. 965-966.) The trial court refused to allow the amendments to the complaint and granted the summary judgment motion.

The appellate court held it was an abuse of discretion to refuse the request to amend the complaint. It concluded that the facts in both the original and amended complaints "all related to [the executive's] discharge" and therefore came within the same general set of facts test which California courts use to determine whether amendments relate back to an earlier complaint. (6 Cal.App.4th at pp. 965-967.)[5] The *Honig* court reasoned that the proposed amendments were a "continuation of the events asserted in the initial pleading." They "finished telling the story begun in the original complaint." (*Id.* at p. 966.)

The *Honig* court went on to state that all the injuries in the proposed complaint—including those asserted in the defamation cause of action— were to be "expected" from a wrongful discharge. The court said, "It is expected that fired employees may have difficulty in obtaining new employment and that allegations surrounding their discharge may be spread to

---

[4]It is not absolutely clear from the statement of facts that the "campaign" of harassment was engendered by the executive's complaining about being forced to commit illegal acts and misrepresent certificates of deposits, but that seems the reasonable import of the text. (See 6 Cal.App.4th at pp. 962-963.)

[5]The "same-general-set-of-facts standard," as Justice Poché used the phrase in his dissent in *Espinosa* v. *Superior Court* (1988) 202 Cal.App.3d 409, 416 [248 Cal.Rptr. 375], may be traced back to *Austin* v. *Massachusetts Bonding & Insurance Co.* (1961) 56 Cal.2d 596, 600 [15 Cal.Rptr. 817, 364 P.2d 681].

others. When an employer discharges an employee it is not unusual for the employer to defend the termination by reasserting the stated reasons for it." Hence even the defamation cause of action related back to the original complaint. (6 Cal.App.4th at p. 967.) Essentially the court said that if an employer terminates someone, the employer can "expect" to be sued for defamation. (*Ibid.*)

In its brief in this appeal, Bank of America struggles valiantly to distinguish *Honig*, arguing that in *Honig* the original lawsuit was filed prior to any adverse action by the employer and that the proposed amendments in *Honig* all related to an existing claim for wrongful termination (whereas here the amended complaint relates to a *new* claim for wrongful *termination*, the old claim being one for wrongful *demotion*). The underlying basis of this attempted distinction appears to be that because the discharge in *Honig* was "imminent," the basic facts in both the original and amended complaints in *Honig* were the same: the actual discharge of the executive.

There are three reasons, however, why *Honig* will not be so distinguished. The first is that in *Honig*, as here, the lawsuit was filed while the plaintiff was still an employee of the defendant and had not yet been fired. There is no gainsaying that in both cases the original complaint was filed *before* the employee was actually terminated, and thus in each case events upon which the amended complaints were based *had not yet happened* when the original complaints were filed.

The second is that the "no adverse action" distinction proffered by Bank of America here is not supported by the facts in *Honig*. While there may have been no *formal* "adverse action" taken in *Honig*, the original complaint did allege a "campaign of harassment" that is analogous to the demotion here. In both *Honig* and the present case it is obvious the employer was displeased with the employee *before* actual termination.

Third, it is inescapable that in *Honig* a defamation action was allowed to relate back to the original complaint when by its very nature that defamation action was predicated on actions that *necessarily* had not yet happened. If a cause of action for defamation based on facts that occurred *after* the filing of the original complaint related back to the original complaint in *Honig*, then a cause of action for wrongful termination based on facts that clearly occurred after the original complaint should relate back here. Actions for wrongful demotion and wrongful discharge easily have a greater common nexus (the nature of an employer's conduct toward an employee) than actions for wrongful discharge and defamation.

The question before us is not whether *Honig* can be distinguished, but whether it should be followed.

## III

We decline to follow *Honig* for two reasons. One, the case is fundamentally inconsistent with settled California law that causes of action do not accrue until after defendants have committed the wrongful act which gives rise to the cause of action in the first place.[6] Two, the case is inconsistent with the way our Supreme Court has construed the same general set of facts test which governs whether amended complaints relate back to original complaints for statute of limitations purposes.

### A

Under section 312 of the California Code of Civil Procedure, civil lawsuits must be commenced within the time prescribed by the statutes of limitation "after the cause of action shall have accrued." ■ It is well settled—perhaps because it is merely common sense—that a cause of action does not begin to "accrue" until after some wrongful act is done. (See *Prudential-LMI Com. Insurance* v. *Superior Court* (1990) 51 Cal.3d 674, 691-693 [274 Cal.Rptr. 387, 798 P.2d 1230] [one-year limitations period in insurance policies tolled during investigation period until insurer denies coverage]; *Aguirre* v. *Lee* (1993) 20 Cal.App.4th 1646, 1654 [25 Cal.Rptr.2d 367] [no cause of action accrued under rent control statute until there was a "wrongful recovery" of the unit]; *Menefee* v. *Ostawari* (1991) 228 Cal.App.3d 239, 245-246 [278 Cal.Rptr. 805] [action for wrongful recovery of rental unit began with wrongful act, which was when landlord endeavored to recover possession]; *Tahoe Pines Co.* v. *Newman* (1922) 59 Cal.App. 186, 190 [210 P. 445] [cause of action by seller for specific performance of land sale contract could not accrue until installments were due]; 3 Witkin, Cal. Procedure (3d ed. 1985) Actions, § 351, p. 380 ["The cause of action ordinarily *accrues* when, under the substantive law, the wrongful act is done and *the obligation or liability arises*, i.e., when a suit may be brought."].)

The *Prudential-LMI* case provides an excellent example of this common-sense rule in action. The Insurance Code requires certain first party insurance policies to contain a one-year "suit provision" which provides that no suit on the policy for the recovery of any claim is sustainable unless "commenced within 12 months next after inception of the loss." (Ins. Code, § 2071.) Before *Prudential-LMI*, the statute's "inception of the loss" language created a practical problem because insurers need at least some time

---

[6]We are not concerned in this opinion with the great body of jurisprudence dealing with the precise point when, *after* some wrongful act is done, a statute of limitations begins to run, e.g., at the precise moment of the act, the time when the act causes damage, or the time when that damage is discovered.

to investigate and act on claims. On the one hand, it is patently unfair for insurers to take a long time investigating a claim and then, when they finally decide not to pay it, successfully argue that the one-year limitations period has already elapsed. (See *Prudential-LMI Com. Insurance* v. *Superior Court*, *supra*, 51 Cal.3d at p. 690 ["One commentator has called it 'unconscionable' to permit the limitation period to run while the insured is pursuing its rights in the claims process."].) On the other hand, it is patently absurd to allow an insurer to be sued for wrongfully denying a claim it has not yet denied. (*Id.* at pp. 692-693 [reference to "anomaly" caused by "literal application" of suit provision which would require suits to be filed prematurely].) The Supreme Court solved the problem by tolling the statutory one-year period from the time the insured gives notice of the loss until the insurer denies coverage for it—that is, until the insurer has actually done something wrong. (*Id.* at p. 693.) That way courts are not cluttered with cases based merely on the *assumption* that insurers are going to wrongfully deny claims that they might, in fact, promptly pay.

In contrast with the reluctance of our Supreme Court in *Prudential-LMI* to allow causes of action based on insurance claim denials that have not yet happened, the court in *Honig* allowed a cause of action for defamation based on *defamatory statements which had yet to be made* when the original complaint was filed to relate back to the original complaint. *Honig* allowed the plaintiff to have the benefit of having commenced a lawsuit based on conduct which had not yet taken place, and, at least at the time of the original complaint, might *never* take place. It was as if the Supreme Court had assumed in *Prudential-LMI* that insurers *always* wrongfully deny claims.

Whether the commonsense rule is required as a matter of constitutional due process we need not decide for the moment. Suffice to say that any rule of procedural law that allows one to be sued for conduct in which one has not engaged because one is "expected" to do the wrong thing in the future is Kafkaesque.

The situation before the court in *Honig* and before us here—causes of action based on facts arising after the original complaint was filed—should be distinguished from lawsuits which are premature because of some procedural matter that did not come into existence until after the complaint was originally filed. *Radar* v. *Rogers* (1957) 49 Cal.2d 243 [317 P.2d 17] is an example of this latter category. There, a tortfeasor injured the plaintiffs in an auto accident and the plaintiff promptly filed a lawsuit against the administrator of the tortfeasor's estate (naming the administrator as a Doe defendant) even though no administrator had yet been appointed. About a year later an administrator was named. The plaintiffs presented a claim to the estate.

The administrator quickly rejected it. A particular section in the probate code required the holders of claims against estates to "bring suit . . . within three months after the date of service" of the notice of rejection of the claim. The plaintiffs in *Radar*, however, waited longer than three months to amend their complaint to allege the true name of the administrator. After a demurrer was sustained without leave to amend, the high court held the plaintiffs had "substantially" complied with the probate code section; their original complaint was, after all, on file "not later than" three months after the notice of rejection. (See 49 Cal.2d at p. 246.) Even though the suit could not really proceed until something happened after it was filed (i.e., the appointment of the administrator), the cause of action was based on facts (an auto accident) which arose before the filing of the original complaint.

The legal doctrines which come to mind as possible bases for "premature" lawsuits—breach of contract based on anticipatory breach of the contract and declaratory relief—still require some action on the part of the defendant to precipitate the lawsuit. For anticipatory repudiation of a contract there must be some act constituting a repudiation. (See *Gold Min. & Water Co.* v. *Swinerton* (1943) 23 Cal.2d 19, 29 [142 P.2d 22].) For declaratory relief there must be an "actual controversy." (Code Civ. Proc., § 1060.)

B

The second reason we decline to follow *Honig* is that it is not faithful to the way our Supreme Court construed the same general set of facts test in *Barrington* v. *A. H. Robins Co.* (1985) 39 Cal.3d 146 [216 Cal.Rptr. 405, 702 P.2d 563]. There, the plaintiff suffered tubal-ovarian abscesses and an infection. In July 1979 she filed an action against her doctor and a drug manufacturer. In February 1980 she filed an amended complaint against an IUD (intrauterine device) maker. The amended complaint was served on the IUD maker in July 1982—less than three years after the amended complaint but more than three years after the original complaint. The IUD maker moved to dismiss because it had not been served within three years of the commencement of the action. The trial court granted the motion but the Supreme Court reversed the dismissal because the amended complaint did *not* relate back to the original.

The court reasoned that the original complaint alleged that plaintiff's injuries were the result of the doctor's negligent medical advice and the failure of the doctor and the drug company to warn of the dangers inherent in the drug. "By contrast," as the opinion noted (39 Cal.3d at p. 152), the amended complaint alleged that the "offending instrumentality" was an unsafe and poorly designed birth control device. The high court perceived

these to be different "operative facts" (see 39 Cal.3d at pp. 151 & 157). Indeed, the court noted that because plaintiff could have filed her action against the IUD maker *separately* she should not be penalized for economically joining her various causes of action in one pleading. (39 Cal.3d at p. 157.)[7]

*Barrington* shows that different acts allegedly leading to the same injuries are not part of the same general set of facts even though the two different acts may, in context, have been part of the same "story" (in *Barrington*, the cause of the tubal-ovarian abscesses and an infection). *Honig*, by contrast, held that different acts (termination of employment as distinct from defaming one's reputation) leading to distinct injuries (loss of a job as distinct from loss of reputation) were part of the same general set of facts *just because* they were part of the same "story."

The two decisions cannot be reconciled on mere result orientation. True, both cases resulted in the plaintiff's amended complaints surviving challenges based on the statutes of limitations. But the same general set of facts test applied in *Barrington* is a neutral principle of law, and therefore does not operate just for the benefit of one side.

We also note that there are two decisions of the Court of Appeal which are contrary to *Honig* under more extreme circumstances than those of the instant case. In *Newton* v. *County of Napa* (1990) 217 Cal.App.3d 1551

---

[7]From the conclusion of the *Barrington* opinion, 39 Cal.3d at page 157, one might gather the erroneous impression that the court was saying the IUD cause of action should have related back to the original complaint. In the first paragraph of the conclusion the court stated: "The failure to apply the relation-back rule when an amended complaint contains a new cause of action based on different operative facts is likely to lead to an absurd result." The next paragraph contained similar language: "The failure to apply the relation-back rule to the present case would be especially harsh." These sentences *sound* like the court was indicating that the IUD cause of action *should* have related back to the original complaint. In reality, however, the court was saying just the opposite.

In *Barrington*, the phrases "relation-back rule" (see 39 Cal.3d at p. 157) and "relation-back doctrine" (*id.* at p. 150), were used to include, albeit somewhat counterintuitively, the idea that causes of action based on a "different set of operative facts and involv[ing] a different 'instrumentality' and 'accident' " do *not* relate back. In essence, the "relation-back rule" entails instances when causes of action do not relate back.

The counterintuitive nature of the "relation-back rule" (as the phrase was used in *Barrington*) is made plain on page 150 of the opinion, where the court explains: "Under this doctrine, if a cause of action in an amended complaint does *not* relate back to the original complaint as to this cause of action, the three-year period [to accomplish service] under section 581a would commence to run from the filing of the amended complaint." (39 Cal.3d at p. 150.) The court then went on to note the plaintiff had conceded that several causes of action had been properly dismissed because they *did* relate back. The court next articulated the plaintiff's contention, with which the court ultimately agreed, that the IUD cause of action *did* not relate back. (*Ibid.*)

[266 Cal.Rptr. 682], the court distinguished between a raid by government officials on a private residence and the bureaucratic decisionmaking that had encouraged the raid, holding that an amended complaint alleging the latter did not relate back to an original complaint alleging the former.[8] In *Espinosa v. Superior Court, supra,* 202 Cal.App.3d 409 the court went so far as to hold that police brutality and witness intimidation by the police to cover up that brutality were different wrongful acts, so that later allegations of intimidation did not relate back to a complaint based on the brutality.[9]

In both *Newton* and *Espinosa* the separate wrongful acts were more closely connected with each other than those here. The bureaucratic "policy" actually led to the raid in *Newton;* the witness intimidation was directed at covering up the brutality in *Espinosa.* In the present case, a fortiori, the subsequent act (the termination) and the former one (the demotion) are independent of each other. There is nothing inherent about the demotion that led to the termination. As we explain below, Lee might have accepted the demotion, never been fired, and still pressed a cause of action for wrongful demotion.

Of course, the same wrongful act can lead to different injuries, so new manifestations of the consequences of one wrongful act may arise after a complaint has been filed and properly relate back to the original. *Lamont v. Wolfe* (1983) 142 Cal.App.3d 375 [190 Cal.Rptr. 874] illustrates this particular twist. A medical malpractice suit was filed by a patient for her own

---

[8]In *Newton,* a married couple sought damages in their original complaint for negligence and battery against county agencies arising out of a gestapo-like raid on the couple's home under the guise of a child abuse report. Almost four years later a first amended complaint sought damages for violation of federal civil rights (42 U.S.C. § 1983). The defendants successfully demurred to the complaint and the judgment of dismissal was upheld on appeal. As to the civil rights violation, the appellate court held that the amended complaint did not relate back for statute of limitations purposes. The court reasoned that the two pleadings alleged "closely related, though distinct, injuries," with distinct causes. The conduct of county officials during the raid caused the injuries in the initial complaint. By contrast, the "adoption of a county-wide policy" of interfering with families' civil rights caused the injuries leading to the civil rights cause of action. (217 Cal.App.3d at p. 1565.)

[9]According to the original complaint in *Espinosa,* the plaintiff was assaulted without provocation when he was wrongfully arrested by local police. The officers sought to cover up their assault by destroying his initial booking photograph. Almost three years later the plaintiff filed an amendment to his complaint, adding a cause of action for violation of federal civil rights (42 U.S.C. § 1983) based on the allegation that *three days after the arrest* the police telephoned the father of a witness to the beating to tell the father to remove his son from the area for the son's own safety. The plaintiff alleged this "witness intimidation" was part of a "continuing" coverup of police misconduct. (202 Cal.App.3d at p. 412.) The appellate court held that the amendment did not relate back, reasoning that the amendment referred to "a different accident (witness intimidation)," a "different injury" (the plaintiff's subsequent "unjust conviction for assault with a deadly weapon"), and "perhaps a different instrumentality (unnamed City agent)." (*Id.* at p. 415.)

injuries and by her husband, for loss of consortium. The patient died, and the husband moved to amend the complaint to allege a cause of action for wrongful death—but only after more than a year had elapsed since the death. After a demurrer based on the statute of limitations was sustained, the appellate court reversed. The defendants argued that it was illogical to apply the relation back doctrine because the cause of action for wrongful death did not exist at the time of the original complaint. The Court of Appeal rejected the point—but *not* because it is possible to sue for wrongful acts not yet committed. Rather, the husband was still seeking "recovery for essentially the *same* loss." (*Id.* at p. 381, italics added.) The wrongful death action was just a "different name" for the original loss of consortium action. (*Id.* at p. 382.)

The closest case of which we are aware to *Honig*'s position of allowing a claim based on an act which had not yet happened at the time of the original complaint is *Bendix Corp.* v. *City of Los Angeles* (1984) 150 Cal.App.3d 921 [198 Cal.Rptr. 370]. *Bendix* grew out of a city tax dispute over gross receipts from federal contracts beginning in the late 1950's and which involved at least 50 other similarly situated contractor-taxpayers. The contractors had initiated their own actions against the city to collect overpaid taxes or were the object of actions by the city to collect underpaid taxes. Certain of "these pending matters" (as the *Bendix* court described them, 150 Cal.App.3d at p. 924) were consolidated and "prosecuted to final decision as a test case." *Bendix*'s claims did not constitute the test case, though *Bendix* agreed with the city to be bound by the results of the test case. It was not until 1977 that the test case was finally decided, resolving the dispute in favor of the contractors. (See *ITT Gilfillan, Inc.* v. *City of Los Angeles* (1977) 72 Cal.App.3d 421 [140 Cal.Rptr. 193] [*ITT Gilfillan I*].)

For nearly two decades while the federal receipts dispute simmered, *Bendix*'s "custom" was to file claims for refunds which the city would "routinely" deny, and then *Bendix* would routinely file a complaint within six months of the denial as required by the Government Code. (*Bendix Corp.* v. *City of Los Angeles*, *supra*, 150 Cal.App.3d at pp. 924 & 927.) However, in 1976 and 1977, as the decision in the test case became imminent, *Bendix* concluded it would be futile to file further formal complaints, and so neglected to do so until after six months since the respective denials, i.e., until after the statute had run on the claims. After the test case came down, the trial court allowed *Bendix* to file a supplemental and amended complaint consolidating its numerous previous complaints, and the issue arose as to whether that complaint should be deemed to relate back to the first complaint, filed back in 1965.

The *Bendix* court first established that it was free to disagree with an opinion arising out of subsequent litigation in the test case, *ITT Gilfillan,*

*Inc.* v. *City of Los Angeles* (1982) 136 Cal.App.3d 581 [185 Cal.Rptr. 484] [*ITT Gilfillan II*], which had held, under almost identical circumstances, that there should be no relation back. (See *Bendix*, *supra*, 150 Cal.App.3d at p. 925.) Most of the *Bendix Corp.* v. *City of Los Angeles* opinion's substantive discussion then consisted of a long quotation (with bracket insertions to make it apply to the case at hand) from a Ninth Circuit case, *William Inglis, etc.* v. *ITT Continental Baking Co.* (9th Cir.1981) 668 F.2d 1014, 1057-1058, the gravamen of which was that when there is no prejudice and the supplemental complaint merely restates allegations in the initial pleading and further alleges " 'only that the claimed violations had continued,' " the relation back rule should apply. (See *Bendix*, *supra*, 150 Cal.App.3d at p. 926, quoting *William Inglis, etc.* v. *ITT Continental Baking Co.*, *supra*, 668 F.2d at pp. 1057-1058.) The court dealt with the logical conundrum of allowing a pleading alleging new events to relate back to one filed prior to those events by stating that the new events were merely " 'a continuation of the old cause of action.' " (*Ibid.*)

As alluded to above, *Bendix* is directly contrary to another appellate decision, *ITT Gilfillan II*, *supra*, 136 Cal.App.3d 581. There, the court reasoned that supplemental complaints categorically should not relate back to original complaints because, by definition, supplemental complaints are based strictly on new matter. (See *ITT Gilfillan II*, *supra*, 136 Cal.App.3d at pp. 588-589.)

We need not resolve the tension between *Bendix* or *ITT Gilfillan II*, or even express an opinion on which is the better reasoned. At the most, *Bendix* merely stands for the idea that where the wrongful act consists of an ongoing legal position about a discrete issue—e.g., how federal contractors should calculate their gross receipts for purposes of certain city codes—a subsequent claim based on that *same legal position* may relate back to an original claim *also* based on that same legal position. *Bendix* is thus a variant of the rule in *Lamont*, discussed above, that one wrongful act can continue to manifest itself after a complaint is filed. After all, in *Bendix* the city's position about how federal contractors should calculate their receipts was formed more than a decade *prior* to the denials based on that position in 1976 and 1977. Indeed, part of the quotation from the Ninth Circuit case relied on by the *Bendix* court states that where claims "rely on *conduct* or events different from those involved in the original action, the statute of limitations *should* be applied." (*Bendix* v. *City of Los Angeles*, *supra*, 150 Cal.App.3d at p. 926, italics added.) To cut to the essence of the matter, the real wrongful act in *Bendix* was not the formal denial of claims in 1976 and 1977, but a tax policy decision that had been made long before.

*Honig* did not grapple with the facts in any previous decision, nor attempt to address the problem of distinct wrongful acts.[10] (See *Honig v. Financial Corp. of America, supra,* 6 Cal.App.4th at pp. 966-967.) Its continuation-of-the-story rationale is contrary to *Barrington* (the next chapter in the "story" of plaintiff's injury), *Espinosa* (the "story" of a "continuing" coverup) and *Newton* (the "story" behind a government raid). Nor was the "continuation" in *Honig* like that of *Bendix.* In *Honig,* the cause of action was for a different act (defaming someone as distinct from terminating his or her employment); in *Bendix,* the cause of action was for fundamentally the same act (calculating federal contract receipts in a certain way). *Honig* simply concluded that because it was not "unusual" for an employer to restate reasons for termination in the process of defending it, the amended complaint for defamation related back to the original complaint filed prior to termination. That is like saying because it is not "unusual" for burglars not to report their ill-gotten gains on their tax returns that they may be prosecuted for tax evasion before the return is due. *Honig* is not persuasive and we will not follow it.

## C

The question still remains: was the amended complaint filed in late April 1991 based on substantially the same general set of facts as the original complaint? As the preceding has demonstrated, the question must be answered "no" if the two documents are based on different wrongful conduct.

About eight years ago, in *Garcia v. Rockwell Internat. Corp.* (1986) 187 Cal.App.3d 1556 [232 Cal.Rptr. 490], another panel of this court held that a wrongful demotion is, in substance, separate and distinct from a wrongful termination and separately actionable in its own right. The decision was quite clear that an employee can maintain a cause of action for disciplinary action imposed against him or her even though the employer does not impose the "ultimate sanction of discharge." (*Id.* at p. 1562.) Of course, if employees are to have legal protection for "whistle-blowing," the rule could hardly be anything else. As the *Garcia* opinion pointed out, employers could take "retaliatory punitive measures" against employees, but immunize

---

[10]The closest it came was a statement that "different damages" did "not indicate there are different injuries" because "injuries may encompass the same primary rights." (*Honig v. Financial Corp. of America, supra,* 6 Cal.App.4th at p. 966, citing *Rowland v. Superior Court* (1985) 171 Cal.App.3d 1214, 1217-1218 [217 Cal.Rptr. 786].) The statement, of course, makes no sense unless one implies into it the word "necessarily." A claim for different damages does not *necessarily* indicate there are different injuries. In any event, the *Honig* court never really came to grips with the problem that the right not to be the object of retaliation for complaining of an employer's noncompliance with the law is different from the right not to be defamed.

themselves by stopping short of termination. (*Ibid.* [to require actual termination "would encourage employers to offer reinstatement . . . to avoid a plaintiff's legitimate legal action"].)

■ Suppose in the present case that Bank of America had not taken the step of firing Lee in late April 1989 and Lee had accepted the assistant manager's position at the branch in Laguna Beach. Would that have been sufficient to defeat the wrongful demotion claim already stated in the complaint then on file? Hardly. Lee's fundamental complaint against the bank was that it was unlawful to demote her for complaining about her supervisor's wrongdoing.

Nor can the original complaint's claim for wrongful demotion be blurred with the amended complaint's claim for wrongful termination under the rubric of "constructive termination," or, as Lee initially styled it, "forced resignation." Her original complaint was not, in substance, one for constructive termination.

■ The idea of "constructive termination" is that working conditions are made so *intolerable* by the employer that the wronged employee is *forced* to quit. As Justice Kennard has written, constructive termination "occurs when an employee is forced to resign as a result of actions or conditions so intolerable that a reasonable person in the employee's position would have resigned . . . ." (*Hunter* v. *Up-Right, Inc.* (1993) 6 Cal.4th 1174, 1196 [26 Cal.Rptr.2d 8, 864 P.2d 88] (dis. opn. of Kennard, J.); see also *Soules* v. *Cadam, Inc.* (1991) 2 Cal.App.4th 390, 399 [3 Cal.Rptr.2d 6].)

A demotion is not a constructive discharge. (*Soules* v. *Cadam, Inc., supra,* 2 Cal.App.4th at p. 401 ["demotion of job level, even when accompanied by reduction in pay, does not constitute constructive discharge"].) There must be some element of intolerability which makes an otherwise voluntary act—resignation—a de facto involuntary one. ■ In the present case there is certainly nothing about being an assistant bank manager in a branch office in Laguna Beach that even remotely suggests the required element of intolerability. Indeed, no reasonable person could seriously suggest that the difference in pay, responsibility, conditions and prestige between being a full-fledged branch manager in Costa Mesa and being an assistant branch manager in Laguna Beach is so great that going from the former to the latter even comes close to being "intolerable." (See *Turner* v. *Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1246 [32 Cal.Rprt.2d 223, 876 P.2d 1022] [". . . conditions giving rise to the resignation must be sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood"].)

We may therefore dispense with the idea that the demotion in March 1988 was somehow the "constructive" equivalent of the discharge that finally occurred in April 1989.

Finally, a common motive—to retaliate against an employee for complaining about wrongdoing—is hardly sufficient to fuse the demotion to the termination. The burglar who returns to the same house twice may have the same motive for each wrongful act—economic gain—but that does not mean that the law must regard the two burglaries as essentially the same general set of facts. In the present case the demotion occurred more than a year prior to the termination and would have been actionable even if the termination had never occurred.

## IV

In light of the foregoing, it is clear that the amended complaint in this case does not relate back to the original. Without relation back there is no question that plaintiff's causes of action in her amended complaint, i.e., those based on wrongful termination, are barred by the applicable statutes of limitations.

The logic of our determination suggests that the causes of action in the original complaint, i.e., those based on wrongful demotion, should not be affected by the running of the statute of limitations on the causes of action in the amended complaint. The question naturally arises as to whether the "amended" complaint filed April 30, 1991, should be characterized as a "supplemental" complaint alleging new facts material to the original complaint. (Cf. Code Civ. Proc., § 464 [allowing supplemental complaints "alleging facts material to the case occurring after the former complaint or answer"].) So characterized, might the judgment be affirmed only so far as it extended to the causes of action based on wrongful termination and reversed as to any causes of action based on the wrongful demotion?

This path, however, is only open to the extent that any causes of action based on wrongful demotion survived in the wake of Lee's filing the amended complaint in 1991. The problem is, none did. When we examine the substance of what went on in this case, the amended complaint of April 1991 functioned as an *original* complaint, not a supplemental one.

No answer was ever filed to the original complaint of March 1989. Bank of America first filed an answer in June 1991 in response to the amended complaint of April 1991. Lee was able to file her amended complaint of

April 1991 as a matter of right, without any need to seek the trial court's permission, precisely because it was filed as an "amended" complaint, not a "supplemental" one. Section 472 of the Code of Civil Procedure provides that "[a]ny pleading may be amended once by the party of course, and without costs, at any time before the answer or demurrer is filed, or after demurrer and before the trial . . . *by filing the same as amended.*" (Italics added.) By contrast, a "supplemental" complaint would have required the permission of the court. Section 464 of the Code of Civil Procedure provides: "The plaintiff . . . may be allowed, *on motion,* to make a supplemental complaint . . . ." (Italics added.) The price of filing the April 1991 complaint without first obtaining permission of the court was that the document necessarily had to be an "amended," not a "supplemental," complaint.

■   An "amended" complaint supersedes all prior complaints. " 'It alone will be considered by the reviewing court.' " (*Foreman & Clark Corp.* v. *Fallon* (1971) 3 Cal.3d 875, 884 [92 Cal.Rptr. 162, 479 P.2d 362], quoting *O'Melia* v. *Adkins* (1946) 73 Cal.App.2d 143, 147 [166 P.2d 298].) The original ceases to " 'perform any function as a pleading.' " (*Foreman & Clark Corp., supra,* 3 Cal.3d 875, 884, quoting *Meyer* v. *State Board of Equalization* (1954) 42 Cal.2d 376, 384 [267 P.2d 257].)[11]

■   We have also considered one last possibility of salvaging Lee's wrongful demotion claim. Might we treat Bank of America's summary judgment motion as a motion for judgment on the pleadings, affirm that part dealing with wrongful termination, but remand to allow Lee to amend her amended complaint to state a cause of action for wrongful demotion?

The answer to this question is also "no" because Lee made no request to amend before entry of the judgment. While there is authority for a reviewing court to treat a summary judgment motion in some circumstances as the functional equivalent of a motion for judgment on the pleadings and reverse to allow leave to amend, that authority requires a prior request to amend at the trial court. (E.g., *Kirby* v. *Albert D. Seeno Construction Co.* (1992) 11 Cal.App.4th 1059, 1067 & 1070 [14 Cal.Rptr.2d 604]; *C. L. Smith Co.* v. *Roger Ducharme, Inc.* (1977) 65 Cal.App.3d 735, 745 [135 Cal.Rptr. 483].)

■   Whereas the pleadings in a demurrer or motion for judgment on the pleadings are (with limited exceptions[12]) the whole focus of the proceeding, they play a more limited role in motions for summary judgment. In the latter

---

[11]There is obviously an exception when the amended complaint does, indeed, relate back to the original. (See 5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 1115, pp. 532-533.)

[12]See 5 Witkin, California Procedure, *supra,* Pleading, section 896, page 337.

their purpose is to " 'delimit the *scope* of the issues.' " (*FPI Development, Inc.* v. *Nakashima* (1991) 231 Cal.App.3d 367, 381 [282 Cal.Rptr. 508], quoting *Orange County Air Pollution Control Dist.* v. *Superior Court* (1972) 27 Cal.App.3d 109, 113 [103 Cal.Rptr. 410], italics added.) Put another way, in summary judgment motions the function of the pleadings is to test the "materiality of the facts tendered in a defendant's challenge to the plaintiff's cause of action." (*FPI Development, Inc.* v. *Nakashima, supra,* 231 Cal.App.3d at p. 381, citing *C. L. Smith Co.* v. *Roger Ducharme, Inc., supra,* 65 Cal.App.3d at p. 745; see also *Krupp* v. *Mullen* (1953) 120 Cal.App.2d 53, 56-57 [260 P.2d 629] [purpose of pleadings in summary judgment motion is to show " 'whether the issues apparently made by the formal pleadings are genuine' "].)

The difference in function makes for a difference as to the possibility of amendment. On demurrer (or motion for judgment on the pleadings), the question is whether the facts alleged in the complaint might support any cause of action, even one not explicitly articulated in the document. If the complaint simply omitted to mention such a cause of action, the court should normally allow leave to amend so that it could be articulated.

By contrast, on summary judgment the question is whether the undisputed facts establish that the moving party is entitled to prevail on the causes of action articulated by the complaint.[13] If the facts will support causes of action not articulated by the complaint, it is incumbent on the pleader to make some request to amend so that the pleading *is* adequate. In the absence of such a request, the court is under no duty to inquire whether there are causes of action or defenses inherent in the facts but not articulated by the pleading. (See *Dorado* v. *Knudsen Corp.* (1980) 103 Cal.App.3d 605, 611 [163 Cal.Rptr. 477], quoting *Krupp* v. *Mullen, supra,* 120 Cal.App.2d 53, 56-57.)[14]

In the case before us, there is nothing in the first amended complaint that would allow us to say that it articulated causes of action based on the events of March 1988 as distinct from April 1989. An examination of the

---

[13]Or, since summary judgment is a two-way street, prevail as a matter of law despite the defenses articulated by the answer.

[14]In *Krupp* and *Dorado* the absence of a request to amend worked to reverse summary judgments. In both cases defendants obtained a summary judgment based on facts which were not part of the defendants' answers. In *Krupp* the court specifically noted there was no request to amend the answer. (See *Krupp* v. *Mullen, supra,* 120 Cal.App.2d at p. 56.) In *Dorado* the court opined that the defendant should be permitted to amend its answer. (*Dorado* v. *Knudsen Corp., supra,* 103 Cal.App.3d at p. 611.) Here, the absence of a request to amend works to affirm a summary judgment which is based, unlike *Krupp* and *Dorado,* on facts which *were* part of the amended complaint.

first amended complaint shows that each cause of action is based on the actual termination of April 1989, not the demotion or "constructive termination" of March 1988. Moreover, Bank of America's moving papers supporting its summary judgment motion emphasized the difference between the "demotion" of March 1988 and the "termination" of April 1989. Even so, no request to amend the complaint was made.[15]

The issues raised in the original complaint were thus completely superseded by the first amended complaint based exclusively on the actual termination of April 1989. In the absence of a request to amend, the statute of limitation issues were delimited by the first amended complaint, and that document "alone" is the one we consider on review of the summary judgment motion.

The judgment is affirmed.

Wallin, J., and Rylaarsdam, J.,* concurred.

A petition for a rehearing was denied August 29, 1994, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied November 3, 1994. Lucas, C. J., and Mosk, J., did not participate therein. Kennard, J., was of the opinion that the petition should be granted.

---

[15]There certainly was no written or oral request to amend. There was an oblique reference at the conclusion of Lee's points and authorities in opposition to the summary judgment motion asserting that if the motion were granted the complaint should be "deemed" amended under section 473 of the Code of Civil Procedure to include causes of action for wrongful discharge in breach of public policy, implied contract and bad faith. This reference, however, cannot be reasonably construed as an application to amend the complaint to assert causes of action based on the events of March 1988. First, it is not at all clear that the reference was even directed at the events of March 1988 (in context, the reference is directed at showing that causes of action existed in *addition* to constructive discharge). Second, there was no compliance with the requirements of a motion to amend a pleading set forth in rule 327 of the California Rules of Court. Finally, the contingent nature of the reference and its context as part of points and authorities in opposition to the summary judgment motion precluded it from effectively giving notice to the adverse party of the attempt to amend. (See Code Civ. Proc., § 473 [court may allow amendment to any pleading "after notice to the adverse party"].)

*Judge of the Orange Superior Court sitting under assignment by the Chairperson of the Judicial Council.