[No. C016761. Third Dist. Sept. 22, 1995.]

PLANNING AND CONSERVATION LEAGUE, INC., et al., Plaintiffs and Respondents, v.
DANIEL E. LUNGREN, as Attorney General, etc., Defendant and Appellant.

*Deleted on direction of Supreme Court by order date January 18, 1996.

## COUNSEL

Daniel E. Lungren, Attorney General, Floyd D. Shimomura, Assistant Attorney General, and Cyrus J. Rickards, Deputy Attorney General, for Defendant and Appellant.

Olson, Hagel, Fong, Leidigh, Waters & Fishburn and George Waters for Plaintiffs and Respondents.

Albert L. Schlosser, McCutchen, Doyle, Brown & Enersen, Terry J. Houlihan, Gregory Bowling, Robert Brundage and Stephanie N. Simonds as Amici Curiae.

## OPINION

**PUGLIA, P. J.**—In this appeal, we hold that freedom of speech is unconstitutionally abridged by a statute which requires a proponent of an initiative measure to certify that no dedicated appropriation has been included in the measure in exchange for a campaign contribution for purposes of qualifying the measure for the ballot.

Senate Bill No. 424, 1991-1992 Regular Session (Stats. 1991, ch. 1189, hereafter SB 424) added former Elections Code section 5358 prohibiting any person from including in the text of an initiative petition an appropriation of money for a particular "project" in exchange for either a campaign contribution or a pledge for a campaign contribution for the purpose of qualifying the initiative for the ballot. SB 424 also amended former Elections Code section 3502 to require initiative proponents, prior to circulation of an initiative petition for signatures, to submit a sworn statement to the Attorney General that no appropriations prohibited by Elections Code section 5358 have been included in the measure. Since the enactment of SB 424, Elections Code sections 5358 and 3502 have been renumbered and are now respectively sections 9607 and 9002 of the Elections Code. (Stats. 1994, ch. 920, §§ 1, 2.) (Statutory references hereafter to sections of an undesignated code are to the Elections Code.) Henceforth, we shall refer to these sections by their current numerical designations.

Plaintiff Planning and Conservation League, Inc. (PCL) submitted an initiative measure to the Attorney General for preparation of a title and summary but did not include the sworn statement required by section 9002 disclaiming the inclusion in the measure of prohibited appropriations. In fact, PCL had solicited and received contributions of money and other

support to qualify the initiative in exchange for including therein appropriations for specific projects sought by the contributors. Because the required sworn statement was not submitted, defendant Attorney General refused to prepare a title and summary for the proposed measure.

Plaintiffs commenced this proceeding for a writ of mandate to compel the Attorney General to perform that statutory duty. The superior court granted relief, holding SB 424 infringes plaintiffs' constitutionally guaranteed rights of free speech and hence is unenforceable. Applying the heightened scrutiny required for measures implicating core First Amendment values, we also conclude SB 424 is unconstitutional. We shall therefore affirm.

I

The California Constitution reserves to the people the power to propose statutes or constitutional amendments. (Cal. Const., art. II, § 8.) "An initiative measure may be proposed by presenting to the Secretary of State a petition that sets forth the text of the proposed statute or amendment to the Constitution and is certified to have been signed by electors equal in number to 5 percent in the case of a statute, and 8 percent in the case of an amendment to the Constitution, of the votes for all candidates for Governor at the last gubernatorial election." (Cal. Const., art. II, § 8, subd. (b).)

Before an initiative petition may be circulated to the electors for qualifying signatures, a draft petition must be submitted to the Attorney General for preparation of a title and summary. (§ 9002.) "Upon receipt of a draft petition, the Attorney General shall prepare a summary of the chief purposes and points of the proposed measure." (§ 9004.) ▆ This is a ministerial duty and must be performed if the petition is in the proper form and submitted in accordance with the appropriate procedures. (*Warner* v. *Kenny* (1946) 27 Cal.2d 627, 630-631 [165 P.2d 889].)

PCL, a private, nonprofit corporation founded in 1965, is engaged in lobbying and other activities for the protection of the environment. After unsuccessful attempts over a period of several years to secure the passage of certain legislation, PCL turned to the initiative process. The estimated cost of qualifying an initiative for the ballot in California is $1 million. PCL's annual operating budget was approximately $250,000. PCL therefore looked elsewhere for financial assistance.

Beginning with Proposition 70, an initiative measure known as the "California Wildlife, Coastal and Park Land Conservation Act of 1988," PCL solicited contributions from other environmental organizations for the purpose of qualifying initiative measures by offering to include in the measures

appropriations for particular projects of interest to the solicited organizations. Proposition 70 authorized issuance of $776 million in general obligation bonds for the acquisition and protection of land and wildlife. In exchange for pledges of campaign contributions from various organizations, PCL included in the measure appropriations for particular projects sought by the contributing organizations. Proposition 70 qualified for the ballot and was eventually approved by the voters.

PCL followed the same procedure to qualify two other initiative measures: Proposition 116, known as the "Clean Air and Transportation Improvement Act of 1990," and Proposition 117, known as the "California Wildlife Protection Act of 1990." Proposition 116 authorized a bond issue of $1,990,000,000 to fund passenger and commuter rail systems. Proposition 117 banned the hunting of mountain lions and created a "Habitat Conservation Fund" to which $30 million is transferred annually for the acquisition and improvement of habitat. In connection with both Propositions 116 and 117, PCL received pledges of contributions in exchange for which it included in the measures appropriations for particular projects of interest to the contributors. Both measures qualified for the ballot and were approved by the voters.

Reacting to these practices, the Legislature in 1990 enacted Senate Bill No. 1495, requiring disclosure in the analysis of an initiative measure in the ballot pamphlet of any appropriation included in the measure in exchange for campaign contributions. This bill was vetoed by Governor Deukmejian who believed it did not go far enough. (Assem. Com. on Elections, Reapportionment and Constitutional Amendments, Rep. on Sen. Bill No. 424 (1991-1992 Reg. Sess.) July 16, 1991.) In 1991, the Legislature responded by enacting SB 424.

SB 424 added section 9607, which provides:

"(a) No person shall include an appropriation for a particular project within the text of an initiative petition in exchange for a campaign contribution or a pledge for a campaign contribution, for purposes of qualifying the petition for the ballot.

"(b) As used in this section and in Section 9002, 'project' means the financing, acquisition, or improvement of land, the construction or reconstruction of structures, improvements, parking structures, and related facilities, including the repair, replacement, maintenance, and operation of the project, and any equipment necessary or convenient for the project.

"(c) Upon a determination by any court that this section has been violated and in the event that the initiative petition has been adopted by the voters,

the appropriation for the particular project is void and any moneys appropriated for the particular project shall revert to the fund from which the moneys were appropriated."

SB 424 amended section 9002 to add the following paragraph: "The written request [submitted by an initiative proponent to the Attorney General for preparation of a title and summary] shall be accompanied by a written statement, signed by each proponent under penalty of perjury, that no appropriation for a particular project contained within the text of the proposed measure, if any, was included in exchange for a campaign contribution or a pledge for a campaign contribution for purposes of qualifying the proposed measure for the ballot."[1]

PCL prepared an initiative measure, the Safe Drinking Water, Fish, and Wildlife Act of 1994 (the Safe Drinking Water Act), to be qualified for the June 1994 Primary Election. This measure would impose a monthly surcharge on nonagricultural water users with the proceeds to be used to cleanse drinking water.

To raise funds and other assistance to qualify the Safe Drinking Water Act, PCL sent letters to 23 environmental organizations throughout the state soliciting assistance in the qualification process in exchange for the inclusion in the initiative of projects of interest to these organizations. The letters warned of the possible effect of SB 424 on specific appropriation commitments given in exchange for campaign contributions to qualify the petition.[2]

Four of the twenty-three solicited organizations responded. Three, including plaintiffs California Trout and The Laguna Greenbelt, Inc., agreed to

---

[1]Section 9002 provides in full: "Prior to the circulation of any initiative or referendum petition for signatures, a draft of the proposed measure shall be submitted to the Attorney General with a written request that a title and summary of the chief purpose and points of the proposed measure be prepared. The title and summary shall not exceed a total of 100 words. [¶] The persons presenting the request shall be known as the 'proponents.' [¶] The Attorney General shall preserve the written request until after the next general election. [¶] The written request shall be accompanied by a written statement, signed by each proponent under penalty of perjury, that no appropriation for a particular project contained within the text of the proposed measure, if any, was included in exchange for a campaign contribution or a pledge for a campaign contribution for purposes of qualifying the proposed measure for the ballot."

[2]Typical of these letters was the one sent to The Laguna Greenbelt, Inc., which read:

"The Planning and Conservation League is considering the possibility of undertaking an initiative to impose a very small fee on urban water users. The revenue from this fee would be used to clean up polluted underground water basins, fund safe drinking water programs, and pay for water related fish and wildlife programs.

"We are interested in including $10 million for a grant to the City of Laguna Beach for the Acquisition of native forests and buffer areas within and contiguous to the Laguna Greenbelt especially within the Laguna Canyon watershed as a specific project in the initiative. We

commit money and assistance in exchange for specific appropriations. The fourth, plaintiff Preserve Our Plateau, declined to commit its resources without assurance the initiative would benefit its project.

Plaintiff Bill Yeates is a director of PCL and plaintiff Jim Hamilton is the Conservation Director of California Trout. As "proponents" of the initiative (see § 9002, fn. 1 *ante* p. 503), Yeates and Hamilton submitted the Safe Drinking Water Act to the Attorney General for preparation of a title and summary. Because the submission was not accompanied by the sworn statement required by section 9002, the Attorney General refused to prepare the title and summary. The superior court mandated the Attorney General to do so. The Attorney General appeals.[3]

---

think such a program would have obvious appeal to Laguna area residents and help us pass the measure.

"Do you think that it would be possible for the Laguna Greenbelt group to either collect signatures or make a financial contribution to the initiative if the project were included in the initiative? While no such contribution would be required to be included in the initiative, we obviously need both volunteer signatures and funding to gain a place on the ballot and run a good campaign.

"In the past we have suggested that each group seeking to include a project gather 5000 signatures or donate $2500 for each million dollars they wish to include in the initiative. Again, such a contribution is not a prerequisite for inclusion in the initiative, but it is important that all groups that are able to do so participate in the effort to qualify and pass the measure.

"We must also inform you that a new law has been passed which prevents the proponents of an initiative (such as myself) from

'includ(ing) an appropriation for a particular project within the text of an initiative petition in exchange for a campaign contribution or a pledge for a campaign contribution for purposes of qualifying the petition for the ballot.'

"After consulting with our attorneys we are not entirely sure what the effect of this law is. However, we want to inform you that this new law conceivably could prevent us from putting the initiative on the ballot, and conceivably could result in your project not receiving its designated funds even if the initiative is passed.

"Please give me a call to discuss the possible inclusion of the Laguna Greenbelt project in the initiative."

[3]Since plaintiffs sought unsuccessfully to have the initiative measure placed on the 1994 primary election ballot, the case is now technically moot. However, the issue presented in this appeal is a matter of significant public importance which will inevitably recur under circumstances where, as here, the controversy will likely become moot before review can be completed. Accordingly, we shall disregard the mootness of the appeal and decide it on the merits. (*Meyer* v. *Grant* (1988) 486 U.S. 414, 417, fn. 2 [100 L.Ed.2d 425, 432, 108 S.Ct. 1886]; *Estate of Hofferber* (1980) 28 Cal.3d 161, 167, fn. 2 [167 Cal.Rptr. 854, 616 P.2d 836].)

## II

The First Amendment to the United States Constitution prohibits any law "abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances." ■ This prohibition is applicable to the states by virtue of the Fourteenth Amendment. (*Meyer* v. *Grant, supra,* 486 U.S. at p. 420 [100 L.Ed.2d at p. 434].)[4]

The First Amendment protects not only the rights of speech and petition but also the right to contribute financial and other support to a political candidate or a ballot measure. (*Citizens Against Rent Control* v. *Berkeley* (1981) 454 U.S. 290, 294 [70 L.Ed.2d 492, 497-498, 102 S.Ct. 434].) In addition, the freedom to speak or to petition the government could hardly be protected from Government interference without a correlative associational freedom to engage in group effort toward these ends. (*Roberts* v. *United States Jaycees* (1984) 468 U.S. 609, 622 [82 L.Ed.2d 462, 474, 104 S.Ct. 3244]; *Hart* v. *Cult Awareness Network* (1993) 13 Cal.App.4th 777, 790 [16 Cal.Rptr.2d 705].)

■ Plaintiffs contend SB 424 infringes their First Amendment rights of speech and association by prohibiting the pooling of resources to qualify an initiative measure for the ballot. Plaintiffs point out that an organization wealthy enough to qualify an initiative on its own is not prohibited from doing so by SB 424, even where the measure provides substantial benefits to the proponent. Only where multiple entities contribute money to qualify an initiative as a quid pro quo for inclusion of particular appropriations therein is SB 424 violated.

■ Those categories of speech and association related to campaigns for political office or issue-based elections reside at the core of the First Amendment. (*McIntyre* v. *Ohio Elections Comm'n* (1995) 514 U.S. __ [131 L.Ed.2d 426, 115 S.Ct. 1511]; *Griset* v. *Fair Political Practices Com.* (1994) 8 Cal.4th 851, 860 [35 Cal.Rptr.2d 659, 884 P.2d 116].) "When a law burdens core political speech, we apply 'exacting scrutiny,' and we uphold the restriction only if it is narrowly tailored to serve an overriding state interest. [Citation.]" (514 U.S. at p. __ [131 L.Ed.2d at p. 440].)

■ The Attorney General contends SB 424 does not burden First Amendment rights and hence need not be subjected to strict scrutiny.

---

[4]The state Constitution contains similar guarantees. (Cal. Const., art. I, §§ 2, 3.) Hereafter, references to the "First Amendment," "First Amendment rights," etc. are intended also to refer to and include the cognate state constitutional guarantees.

According to the Attorney General, those desiring to contribute to an initiative measure or to suggest projects to be funded therein are not precluded from doing so. SB 424 prohibits only contributions made in direct exchange for including appropriations for projects in the initiative. The Attorney General argues this has only an incidental effect on freedom of association.

■ Not every governmental regulation implicating First Amendment or other fundamental rights is subject to strict judicial scrutiny. On the contrary, "[i]t is only when there exists a real and appreciable impact on, or a significant interference with the exercise of the fundamental right that the strict scrutiny doctrine will be applied. [Citations.]" (*Fair Political Practices Com.* v. *Superior Court* (1979) 25 Cal.3d 33, 47 [157 Cal.Rptr. 855, 599 P.2d 46].) "When the regulation merely has an incidental effect on the exercise of protected rights," the First Amendment is not implicated and the regulation need only be reasonable. (*Ibid.*; *Zablocki* v. *Redhail* (1978) 434 U.S. 374, 386-387 [54 L.Ed.2d 618, 631, 98 S.Ct. 673]; *Gould* v. *Grubb* (1975) 14 Cal.3d 661, 670 [122 Cal.Rptr. 377, 536 P.2d 1337].)

■ In our view, SB 424 has more than an incidental impact on First Amendment rights. "Contributions by individuals to support concerted action by a committee advocating a position on a ballot measure is beyond question a very significant form of political expression." (*Citizens Against Rent Control* v. *Berkeley, supra,* 454 U.S. at p. 298 [70 L.Ed.2d at p. 500].) Often, it is the only means for individuals or private entities to influence the political process in any meaningful way. "[T]he practice of persons sharing common views banding together to achieve a common end is deeply embedded in the American political process. . . . The tradition of volunteer committees for collective action has manifested itself in myriad community and public activities; in the political process it can focus on a candidate or on a ballot measure. Its value is that by collective effort individuals can make their views known, when, individually, their voices would be faint or lost." (*Id.* at p. 294 [70 L.Ed.2d at pp. 497-498].)

Emphasizing that SB 424 does not preclude concerted activity, only quid pro quo arrangements, the Attorney General points out that during the same period PCL was purportedly unable because of SB 424 to qualify the Safe Drinking Water Act for the ballot, it was successful in qualifying another environmental bond measure, entitled "Park Lands, Historic Sites, Wildlife and Forest Conservation Bonds. Initiative Statute."[5]

However, government action need not amount to a total ban on concerted activity before giving rise to heightened scrutiny. In *Meyer* v. *Grant, supra,*

---

[5]We grant the Attorney General's request that we judicially notice that this initiative measure qualified for the June 1994 Primary Election. (Evid. Code, § 452, subd. (c).)

486 U.S. 414 [100 L.Ed.2d 425], state legislation prohibited the use of paid signature gatherers for qualifying an initiative measure. The court applied strict scrutiny despite the fact the legislation did not preclude the use of independent signature gatherers (providing they were not paid for their services) or the gathering of signatures. It was enough that the legislation placed a more than incidental burden on protected activity.

SB 424 also burdens protected First Amendment activities in more than an incidental way. It appreciably reduces the likelihood of success in placing an initiative measure on the ballot. Those without sufficient funds to qualify a measure on their own must rely on outside sources. SB 424 makes it less likely that outside sources will materialize. Strict scrutiny is therefore appropriate.

### III

In order to satisfy strict scrutiny, a law must be neither vague nor substantially over- or underinclusive. (See *Schad* v. *Mount Ephraim* (1981) 452 U.S. 61, 71-74 [68 L.Ed.2d 671, 682-684, 101 S.Ct. 2176]; *City of Indio* v. *Arroyo* (1983) 143 Cal.App.3d 151, 157 [191 Cal.Rptr. 565].) It must further an overriding state interest yet be drawn with narrow specificity to avoid any unnecessary intrusion on First Amendment rights. (*McIntyre* v. *Ohio Elections Comm'n*, *supra*, 514 U.S. at p. __ [131 L.Ed.2d at p. 440]; *H-CHH Associates* v. *Citizens for Representative Government* (1987) 193 Cal.App.3d 1193, 1207 [238 Cal.Rptr. 841].)

It is generally recognized the initiative process was adopted as a reaction to the perceived dominance of the Legislature by special interest groups whose wealth and influence had been able to defeat popularly supported legislation. (Lowenstein & Stern, *The First Amendment and Paid Initiative Petition Circulators: A Dissenting View and a Proposal* (1989) 17 Hastings Const.L.Q. 175, 200.) In recent years, however, there has been growing concern that the initiative process itself has become dominated by special interests. (*Id.* at pp. 176-177.)

SB 424 was enacted to halt one method by which special interests were perceived as using the electoral process to appropriate public funds for their own benefit. (Assem. Com. on Elections, Reapportionment and Constitutional Amendments, Rep. on Sen. Bill No. 424 (1991-1992 Reg. Sess.) July 16, 1991.) According to the author of the bill: "It is prohibited by law to trade money for law in the Legislature, but it's perfectly legal—and presumably appropriate—to do so in the initiative process. That is surely no way to make rational public policy. Indeed, these *quid pro quo* arrangements have

been likened to the electoral version of 'Let's Make a Deal.'" (Letter from State Sen. Quentin Kopp to Gov. Pete Wilson, Sept. 19, 1991, italics in original.) Other arguments in support of SB 424 suggest the practice of trading appropriations for initiative support "resembles vote-buying in the Legislature, which is against the law and which the sponsors of initiatives would be the first to condemn." (Sen. Rules Com., Floor Analysis of Sen. Bill No. 424 (1991-1992 Reg. Sess.) Arguments in Support, Sept. 12, 1991.)

 The prevention of corruption or its perception in the electoral process is a legitimate, indeed compelling, governmental interest. (*Griset* v. *Fair Political Practices Com.*, *supra*, 8 Cal.4th at pp. 861-862.) "Preserving the integrity of the electoral process, preventing corruption, and 'sustain[ing] the active, alert responsibility of the individual citizen in a democracy for the wise conduct of government' are interests of the highest importance." (*First National Bank of Boston* v. *Bellotti* (1978) 435 U.S. 765, 788-789 [55 L.Ed.2d 707, 725, 98 S.Ct. 1407], fn. omitted.)

However, in our view SB 424 is not narrowly tailored to achieve this legitimate goal. In fact, it is questionable whether the legislation serves the interest of preventing corruption at all.

Concerns over corruption associated with contributions to candidates for public office lack resonance in the context of a ballot measure. (*Citizens Against Rent Control* v. *City of Berkeley*, *supra*, 454 U.S. at pp. 297-299 [70 L.Ed.2d at pp. 499-500]; *First National Bank of Boston* v. *Bellotti*, *supra*, 435 U.S. at p. 789 [55 L.Ed.2d at p. 726].) As the Fifth Circuit Court of Appeals explained in *Let's Help Florida* v. *McCrary* (5th Cir. 1980) 621 F.2d 195, 199-200: "When people elect a candidate, they choose someone to whom they delegate their political decisionmaking. The people's need to prevent large contributions from improperly influencing this representative decision-maker is critical. In contrast, when people vote on a referendum proposal, they directly decide the pertinent political issue for themselves. Large contributions for publicity by one group or another do not influence the political decisionmakers—in this case, the voters themselves—except in a manner protected by the first amendment."

Whatever else may be said about it, the practice condemned by SB 424 is hardly an invitation to corruption. Not only does the voting public decide the pertinent political issue, but the voters are made fully aware that particular appropriations are included in the measure. The electorate itself can decide whether to support a measure containing specific appropriations of particular concern to special interests, just as the proponents can decide whether to risk rejection of the entire measure by the inclusion of a particular appropriation.

Moreover, "the risk of fraud or corruption, or the appearance thereof, is more remote at the petition stage of an initiative than at the time of balloting." (*Meyer* v. *Grant, supra,* 486 U.S. at p. 427 [100 L.Ed.2d at p. 438].) There is no attempt at this stage to influence any vote, only an effort to secure the right to a vote. (*League of Women Voters* v. *Countywide Crim. Justice Coordination Com.* (1988) 203 Cal.App.3d 529, 550 [250 Cal.Rptr. 161].) There is ample opportunity thereafter for the electorate to educate itself about the measure before a final decision is made.

Finally, SB 424 is underinclusive. It applies only to initiative measures in which appropriations are made for "financing, acquisition, or improvement of land, the construction or reconstruction of structures, improvements, parking structures, and related facilities." (§ 9607, subd. (b).) If the concerns with corruption which animated SB 424 are real, they are no less relevant to initiative measures involving matters unrelated to the acquisition or construction of real property. For example, a measure appropriating public funds for health care research would seem to be as much a temptation to corruption to private providers of health care research seeking public allocations for their specific projects.

The essence of corruption is secrecy, and its paradigm is the smoke-filled room where political "deals" are struck concealed from public scrutiny. However, there is nothing secret about the quid pro quo arrangements forbidden by SB 424. On the contrary, the voting public is fully informed of specific appropriations made in an initiative measure and can decide for itself whether to vote for it. If it is desirable to inform the electorate of any quid pro quo arrangements, this can be done by more narrowly tailored means, such as in the ballot pamphlet as provided in former Senate Bill No. 1495, 1989-1990 Regular Session. However, SB 424 goes too far and thereby violates the First Amendment rights of proponents of land-based initiatives and those who wish to make common cause with them.[6]

The judgment is affirmed. Plaintiffs are to recover their costs on appeal.

Davis, J., and Raye, J., concurred.

---

[6]Having so concluded, we need not consider plaintiffs' equal protection challenge or their claim SB 424 is fatally vague and overbroad.