[No. G018411. Fourth Dist., Div. Three. Dec. 30, 1998.]

PAUL McCAULEY, Plaintiff and Respondent, v.
HOWARD JARVIS TAXPAYERS ASSOCIATION et al., Defendants and
Appellants.

1256

COUNSEL

Straw & Gilmartin, Straw & Gough, Lawrence J. Straw, Jr., and Paul T. Gough for Defendants and Appellants.

Rosenberg, Nagler & Phillips, Gary S. Phillips and Anthony Kornarens for Plaintiff and Respondent.

OPINION

**SILLS, P. J.**—The private "bounty hunter" provisions of California's Political Reform Act of 1974 allow private individuals to sue organizations which raise money to advocate positions on ballot initiatives for reporting errors. The decision of the United States Supreme Court involving an Ohio case, *McIntyre* v. *Ohio Elections Comm'n* (1995) 514 U.S. 334 [115 S.Ct. 1511, 131 L.Ed.2d 426] (striking down statute outlawing anonymous campaign literature), raises thorny problems involving the constitutionality of California's reporting statute, at least as it applies to private organizations engaged in "issue advocacy" (as distinct from "express advocacy" on behalf of a "clearly identified candidate").[1] (See *Virginia Soc. for Human Life Inc.* v. *Caldwell* (4th Cir. 1998) 152 F.3d 268, 275 [holding that certain Virginia

---

[1]*McIntyre* made it clear that laws regulating political expenditures receive the closest level of scrutiny: "When a law burdens core political speech, we apply 'exacting scrutiny,' and we uphold the restriction only if it is narrowly tailored to serve an overriding state interest." (*McIntyre* v. *Ohio Elections Comm'n, supra*, 514 U.S. 334, 347 [115 S.Ct. 1511, 1519].) At the same time, the more venerable case of *Buckley* v. *Valeo* (1976) 424 U.S. 1 [96 S.Ct. 612, 46 L.Ed.2d 659] early on established an important distinction between, on the one hand, issue advocacy and, on the other, express advocacy on behalf of a clearly identified candidate. (See *id.* at p. 44, fn. 52 [96 S.Ct. at p. 643]; see also *American Constitutional Law Foundation* v. *Meyer* (10th Cir. 1997) 120 F.3d 1092, 1102 ["The disclosures in *Buckley* were limited to candidate elections . . . ."].) As between the two, issue advocacy "receives greater protection under the First Amendment." (*Vermont Right to Life Committee, Inc.* v. *Sorrell* (D.Vt. 1998) 19 F.Supp.2d 204, 213.)

When it comes to nonprofit organizations that conduct issue advocacy through the referendum process, the reasons the *Buckley* court identified as justifying regulations involving candidate advocacy (providing public with information on origin and use of campaign funds, deterring quid pro quo corruption, and gathering information to detect violations of contribution limits [see *Buckley* v. *Valeco, supra*, 424 U.S. at pp. 66-68 [96 S.Ct. at pp. 657-658]]) have decidedly less force—to say the least; they may not apply at all. (See *American Constitutional Law Foundation* v. *Meyer, supra*, 120 F.3d at pp. 1104-1105 [holding that disclosure requirements on paid petition circulators were unconstitutionally overbroad because none of the three compelling interests identified by the *Buckley* court were present].) Thus in *Planning & Conservation League, Inc.* v. *Lungren* (1995) 38 Cal.App.4th 497 [45 Cal.Rptr.2d 183], the Court of Appeal struck down provisions of California statutes that were aimed directly at quid pro quo corruption in the initiative process because any "corruption" was more apparent than real. The voting public could "decide for itself" how to vote on an initiative which was the supposed result of quid pro quo corruption. (See *id.* at pp. 507-509

reporting requirements were not unconstitutional because state's highest court had confined those requirements to "groups that expressly advocate the election or defeat of a clearly identified candidate"].)

Fortunately, we can skirt the thorny constitutional problems in this case. Under the more prosaic law of civil procedure, the judgment against the organization founded by antitax crusader Howard Jarvis for violating those reporting requirements in one particular instance cannot stand, even if those reporting requirements were constitutional as applied. In particular, settled principles of civil procedure require us to conclude that the bounty hunter must allege the *specific* reporting violation within the allowable time period. It is not enough to allege there might be as yet *undiscovered* reporting violations. Because the particular reporting violation which gave rise to the judgment in this case was not alleged until after the statute of limitations had run, we reverse that judgment and direct the trial court to enter a new judgment in favor of the defendants.

## FACTS

On October 20, 1988, Paul McCauley filed a complaint for "damages" against the California Tax Reduction Movement (Movement),[2] and several other parties not in this appeal, for intentionally or negligently violating the "reporting requirements of the Political Reform Act of 1974." The complaint mentioned only one specific violation: In 1984, the defendants had organized something called the "Committee for Over 1 Million Taxpayers to Save Proposition 13, A Project of CTRM" (the Committee). The Committee was

[striking down Elections Code provisions that precluded environmental organization from soliciting contributions from other environmental organizations to qualify Safe Drinking Water Act by initiative in return for inclusion in initiative of other projects of interest to the solicited organizations].) By the same token *North Carolina Right to Life, Inc.* v. *Bartlett* (E.D.N.C. 1998) 3 F.Supp.2d 675, 679 went so far as to declare that laws subjecting groups engaged "only in issue advocacy" to "spending restrictions and reporting requirements" would violate the First Amendment as interpreted by *Buckley.*

Given that there is at least a substantial question in the case before us as to the constitutionality of a law requiring forced disclosure of political expenditures by issue advocates such as the California Tax Reduction Movement, this court requested the parties to brief the impact of *McIntyre* on the reporting requirements which form the basis of the plaintiff's suit here. After all, both the defendants in this case and Mrs. McIntyre were quintessential issue advocates: antitax protesters. As it turns out, however, this case can be decided on a humble statute of limitations point, and the constitutional conundrums saved for another day.

[2]Sometimes also referred to in this opinion as "the Movement."

Along the way the complaint was amended to include the Howard Jarvis Taxpayers Association in place of one of the Doe defendants, as the Howard Jarvis Taxpayers Association had assumed all the debts and liabilities of the California Tax Reduction Movement. Both the Howard Jarvis Taxpayers Association and the California Tax Reduction Movement are parties to this appeal.

formed to help pass Proposition 36 on the November 1984 ballot. McCauley alleged that Movement was obligated to report contributions received from, and expenditures made on behalf of, this committee "and others."[3]

Almost four years later, on October 7, 1991, McCauley filed his first amended complaint, which reiterated the allegations regarding the committee formed to pass Proposition 36, and included additional allegations of violations of the reporting laws concerning various political campaigns over the years, including committees to recall and defeat former Chief Justice Rose Bird, and to solicit and raise funds for the Taxpayers Voting Rights Act Campaign involving Proposition 62 in the 1986 election.

Movement demurred to the first amended complaint on, among other grounds, the running of the statute of limitations. The demurrer was overruled, and the case came to trial in November 1994, with McCauley seeking money for a number of reporting violations. The trial court, however, entered a judgment based *solely* on reporting violations connected to a single letter related to Proposition 62 in 1986. That letter, referred to as "Job 1108," was written on the stationery of Mrs. Howard Jarvis roughly six days after Howard Jarvis's death. According to McCauley, the entirety of the expense of mailing the letter, and all the receipts from the letter, should have been reported as related to the Proposition 62 campaign even though *none* of the money received was actually used to promote Proposition 62 in the 1986 campaign.[4] The trial judge agreed, and entered a judgment against Movement for $600,000, plus some $524,127 in attorney fees and costs. From that judgment Movement, and its successor in interest, the Howard Jarvis Taxpayers Association, have appealed. Because the statute of limitations issue is dispositive, we do not address a number of the other complex issues raised by the parties.[5]

---

[3]We set out the complete text of paragraph 13 of the original complaint at footnote 13 *post*, when we discuss the text in more detail.

[4]Because we decide this case on the statute of limitations issue, we spare ourselves the need to confront whether *any* reporting involving the Job 1108 letter was required given the remarkable fact that none of the money actually went to the Proposition 62 campaign. Suffice to say, however, that in interpreting the Political Reform Act of 1974, First Amendment considerations must necessarily favor not placing a person or political committee in the position of being required to *misrepresent* actual facts in order to avoid civil liability. Surely if the First Amendment precludes anything, it precludes compelled false speech.

[5]These include the constitutionality problems already mentioned (cf. fn. 1, *ante*), whether the reporting requirements were substantially complied with in any event, and whether the award of $600,000 required proof of the defendants' financial condition because it was, in effect, punitive damages, or was otherwise overstated.

## DISCUSSION

### *The Statute of Limitations Precludes Recovery for a Cause of Action Based on Any Reporting Violations in Connection With Mrs. Jarvis's Letter*

The Political Reform Act of 1974 occupies title 9 of California's Government Code; the enforcement provisions are in chapter 11 of title 9, beginning with section 91000 of the Government Code.[6] Section 91004 provides authority for a private citizen to bring a civil action against any person who even "negligently violates any of the reporting requirements" of the act for "an amount not more than the amount or value not properly reported."[7] However, the right is not just private citizens' *alone*. Significantly, the statute gives a right to sue to "the civil prosecutor or [to] a person residing within the jurisdiction." Another statute, section 91007, requires private citizen plaintiffs to "first file with the civil prosecutor a written request *for the civil prosecutor* to commence the action." (Italics added.) That request must "include a statement of the grounds for believing a cause of action exists." In response to this request, the civil prosecutor must respond within 40 days of receipt of the request, and if he or she accepts the request, the private citizen may *not* bring an action—it is the *exclusive* province of the civil prosecutor. Thus it is only after would-be private litigants have made their written requests for the civil prosecutor to take the case, stated the grounds why a cause of action exists and been turned down, that they may sue in their own names.[8]

 The statute of limitations in the Political Reform Act of 1974 is found in section 91011. It is a four-year statute. The statute begins running for violations "in connection with a report or statement" required under the act from the date "after an audit could begin as set forth in subdivision (c) of

---

[6]All statutory references in this opinion are to the Government Code.

[7]Here is section 91004 in its entirety, as it read at the time of McCauley's original and first amended complaints: "Any person who intentionally or negligently violates any of the reporting requirements of this act . . . shall be liable in a civil action brought by the civil prosecutor or by a person residing within the jurisdiction for an amount not more than the amount or value not properly reported." In 1996, Proposition 208 added the words "or who aids and abets any person who violates any of the reporting requirements of this act" just before the words "shall be liable . . . ."

[8]Here is subdivision (a) of section 91007 in its entirety: "Any person, before filing a civil action pursuant to Sections 91004 and 91005, must first file with the civil prosecutor a written request for the civil prosecutor to commence the action. The request shall include a statement of the grounds for believing a cause of action exists. The civil prosecutor shall respond within forty days after receipt of the request, indicating whether he intends to file a civil action. If the civil prosecutor indicates in the affirmative, and files suit within forty days thereafter, no other action may be brought unless the action brought by the civil prosecutor is dismissed without prejudice as provided for in Section 91008."

Section 90002." For other violations the time begins running from the date the violation occurred."[9]

Subdivision (c) of section 90002 states that the time for an audit of those required to file reports involving ballot measures is "the last date for filing the first report or statement following the general, runoff or special election . . . at which the measure was adopted or defeated."[10] The last date for filing reports is governed by section 84200, which plainly states that (with certain exceptions not applicable to the case before us) the deadline for reports is no later than January 31 for the semiannual period ending December 31.[11] In the present case, Mrs. Jarvis's letter was written in August of 1986 and mentioned upcoming Proposition 62 for the November 1986 election. The last date for filing the first report was thus January 31, 1987 (assuming that McCauley was at all right that a report was even required). Four years later brings us to January 31, 1991.

As we have mentioned, the first amended complaint was not filed until October 1991—some nine months after the January 31 deadline.

Given that the original complaint was filed in October 1988, the obvious question is whether the first amended complaint relates back to the original. McCauley asserts that it must, because the first amended complaint relates to

---

[9]Here is the entirety of the text of section 91011: "(a) No civil action alleging a violation in connection with a report or statement required by Chapter 4 (commencing with Section 84100) of this title shall be filed more than four years after an audit could begin as set forth in subdivision (c) of Section 90002. [¶] (b) No civil action alleging a violation of any provisions of this title, other than those described in subdivision (a), shall be filed more than four years after the date the violation occurred." Subdivision (a) of section 91011 used to refer to "subdivision (b) of Section 90002," but that typographical error was corrected in 1997. (See Stats. 1997, ch. 455, § 7.)

[10]Subdivision (c) of section 90002 provides in pertinent part: "No audit or investigation of any candidate, controlled committee, or committee primarily supporting or opposing a candidate or a measure in connection with a report or statement required by Chapter 4 of this title, shall begin until after the last date for filing the first report or statement following the general, runoff or special election for the office for which the candidate ran, or following the election at which the measure was adopted or defeated . . . ."

[11]Here are the pertinent parts of subdivisions (a) and (b) of section 84200:

"(a) Except as provided in paragraphs (1), (2), and (3), elected officers, candidates, and committees pursuant to subdivision (a) of Section 82013 shall file seminannual statements each year no later than July 31 for the period ending June 30, and no later than January 31 for the period ending December 31.

". . . . . . . . . . . . . . . . . . . . .

"(b) All committees pursuant to subdivision (b) or (c) of Section 82013 shall file campaign statements each year no later than July 31 for the period ending June 30, and no later than January 31 for the period ending December 31, if they have made contributions or independent expenditures, including payments to a slate mailer organization, during the six-month period before the closing date of the statements."

the "same general set of facts" as the original—namely, Movement's "ongoing duty to file campaign reports."

McCauley's proposed application of the "same general set of facts" test to the reporting requirements affecting *different* sets of direct mail is absurdly broad. In *Lee* v. *Bank of America* (1994) 27 Cal.App.4th 197 [32 Cal.Rptr.2d 388], this court had occasion to explore the contours of the "same general set of facts" test as explicated by our Supreme Court in *Barrington* v. *A.H. Robins Co.* (1985) 39 Cal.3d 146 [216 Cal.Rptr. 405, 702 P.2d 563] (and originally in *Austin* v. *Massachusetts Bonding & Insurance Co.* (1961) 56 Cal.2d 596, 600 [15 Cal.Rptr. 817, 364 P.2d 681]), and by the Court of Appeal in *Newton* v. *County of Napa* (1990) 217 Cal.App.3d 1551 [266 Cal.Rptr. 682], *Espinosa* v. *Superior Court* (1988) 202 Cal.App.3d 409 [248 Cal.Rptr. 375], *ITT Gilfillan, Inc.* v. *City of Los Angeles* (1982) 136 Cal.App.3d 581 [185 Cal.Rptr. 848], and *Bendix Corp.* v. *City of Los Angeles* (1984) 150 Cal.App.3d 921 [198 Cal.Rptr. 370]. We need not redo the work done in *Lee*. Suffice to say that *Lee* stands for the wholly unremarkable proposition that different acts leading to distinct injuries are *not* part of the "same general set of facts" even though they may be part of the same "story." (*Lee, supra*, 27 Cal.App.4th at p. 208.)

The idea that different reporting violations by a single defendant somehow are part of the same general set of facts implicitly rests on a premise which this court explicitly rejected in *Lee*: the "bad egg" theory of the relation back doctrine. That is, the defendant is assumed to be a bad egg and it is irrelevant that the act sued on wasn't mentioned in the earlier complaint because it is the "sort of mischief" the defendant was inclined to get up to anyway. As we explained in *Lee*, such a premise necessarily runs counter to the most fundamental precepts of justice and reduces to absurdity. One could even be sued for acts one has *yet* to do because one is assumed to be "that sort of person." (See *Lee* v. *Bank of America, supra*, 27 Cal.App.4th at p. 206 [describing bad egg approach as "Kafkaesque"].)

Here, the bad egg approach is epitomized in McCauley's relation back argument. Because Movement has an "ongoing" duty to file campaign reports, he believes it is enough that he originally filed his complaint based on one report. But that wholly ignores the fundamental nature of the wrongful act asserted. The requirement for committees to file statements is a semiannual one. (§ 84200, subd. (a).) Reporting violations, given the discrete deadlines, are necessarily discrete events themselves, not continual ones. McCauley impliedly conceded as much himself by going to trial on a variety of separate reporting violations and by bringing a cross-appeal regarding several of them.

Moreover, to hold that separate reporting violations could be part of one blurred "ongoing duty" to file reports flies in the face of section 91007, which requires the private litigant to first give the civil prosecutor a right of first refusal of any reporting violation.[12] If parties could bring actions under section 91004 based on just one homogenized general ground (e.g., "the Acme Political Action Committee doesn't file statements like it is supposed to"), then the right of first refusal could be easily circumvented, and one request, either routinely processed or overlooked by the local prosecutor, would give a private litigant carte blanche regarding a wide variety of alleged violations, some of which a prosecutor might very well want to prosecute.

Manifestly, Proposition 36 was not Proposition 62. They are barely part of the same novel, much less the same "story," and most certainly not the same set of facts. The only thing they had in common was the same sponsoring organization.

Nor does McCauley's argument that the letter involving Proposition 62 was encompassed in the original complaint hold any water either. The two words "and others" used in paragraph 13 of the original complaint cannot by any stretch of the imagination—particularly within the context in which they were used[13]—possibly encompass separate reporting violations arising out of separate mailers not even mentioned in the original complaint.

Much of McCauley's response to the statute of limitations issue is a waiver argument, which comes in two prongs. The first borders on sophistry. McCauley asserts that Movement has "implicitly" conceded that "there was no distinction between the original Complaint and the First Amended Complaint" regarding Job 1108; hence there is no real statute of limitations issue, but rather a simple assertion that the letter was not "within the purview" of the *amended* complaint. In point of fact, however, Movement *has* asserted that there *is* a difference between the original and amended complaints as far as the Proposition 62 allegations are concerned. The former did not mention Job 1108 even indirectly; the latter did.

The second argument belies Movement's supposed waiver of the statute of limitations issue. McCauley argues that the Movement never objected to the

---

[12]Section 91007 provides in pertinent part: " . . . The request shall include a statement of the grounds for believing a cause of action exists. . . ."

[13]Here is the complete text of paragraph 13 from the original complaint:

"Defendants, and each of them, intentionally and/or negligently violated the reporting requirements of the Political Reform Act of 1974, as amended, by failing to cause CTRM to report the contributions received from Million and others and/or the expenditures made as hereinabove alleged, all in violation of California Government Code Section 84211."

The prior paragraph was exclusively devoted to Proposition 36. Thus in context, it is clear that the "and others" refers only to contributions given to help pass Proposition 36.

trial court's consideration of Job 1108. What McCauley ignores, however, is that the Movement filed a demurrer to the first amended complaint which specifically raised the statute of limitations defense. That demurrer was overruled. Raising an issue by an unsuccessful demurrer is enough to preserve the issue for appeal. (Code Civ. Proc., § 647 ["All of the following are deemed excepted to: . . . an order . . . overruling a demurrer . . . ."].) Having made the statute of limitations argument by demurrer and lost, the Movement can hardly be faulted for not rebeating the dead horse as trial approached. At best, the defendants would have been gently tolerated for making an argument already decided by the trial court, at worst they might have incurred the wrath of the trial court and sanctions.

### The Cross-appeal

As if to underscore the separate nature of the diverse claims McCauley ultimately alleged against the Jarvis organization, he has brought a cross-appeal based on *other* mailers in addition to Job 1108 involving 1986's Proposition 62. He claims the money expended and received on these mailers was incorrectly held by the trial judge *not* to be covered by the Political Reform Act of 1974:

(1) The expenses concerning Job 711, apparently advocating the reelection of Governor George Deukmejian and the defeat of Senator Alan Cranston in the 1986 elections.

(2) The expenses of and contributions received from Job 792, involving the Taxpayers' Voting Rights Initiative.

(3) The expenses of and contributions received from Job 712, sent out in 1985, involving a "three-part strategy" to "strengthen Proposition 13."

(4) The expenses of and contributions received from Job 1530, which McCauley asserts was part of the effort to defeat Proposition 71 on the June 1988 ballot.

What we have already said about the statute of limitations concerning Proposition 62 in 1986 is dispositive for (1), (2) and (3), none of which were alleged in the original complaint and all of which involved matters from 1986 or earlier.

As to (4), it is enough to note that substantial evidence supports the trial judge's determination that the moneys received from the letter were not reportable because it did not (in the trial judge's phrase) "cross the line"

into "express advocacy."[14] The letter was sent *after* the election and contained no express statement advocating the defeat of Proposition 71. At worst the reader might *infer* from the text of the letter that Proposition 71 was a bad idea, but there is nothing that expressly advocated its defeat. Moreover, on its face the letter differentiated the funds it was seeking from the campaign against Proposition 71. Rather, it solicited money to pay *undefined* "bills" that the reader was told were not paid so that the then ongoing campaign against Proposition 71 could "continue." When read as a whole, the point of the letter is that the *Movement's* strength was depleted and needed replenishing. We thus agree with the trial judge that the letter did not "cross the line."[15]

McCauley further argues that by virtue of the trial judge's ruling regarding Job 1108, the Movement was thereafter a "committee" under section 82013, subdivision (a), and was required to file semiannual statements thereafter (as required by section 84200) until its status as a "committee" was terminated (see § 82013, referencing § 84214).

The trial judge squarely rejected McCauley's theory by comparing two statutes and using some common sense. Section 91004 states that the liability for negligently violating reporting requirements is *not more than* the value not reported. Section 91005, by contrast, allows a liability for up to *three times* the amount of the unlawful contribution in certain more egregious cases, such as unlawful contributions by lobbyists. The judge further noted that the purpose of the Political Reform Act of 1974 was not to "enrich a private citizen." By putting one plus one plus one equals three together, the trial judge concluded that nonprofit corporations such as the Movement

---

[14]Section 18225, subdivision (b) of title 2 of the California Code of Regulations requires the money be spent for "communications which expressly advocate the . . . passage or defeat of a clearly identified ballot measure." We need not now decide whether the regulation's extension of *Buckley*—which confined itself to clearly identified *candidates*—to ballot measures can withstand constitutional challenge. We shall assume for sake of argument that express advocacy regarding a ballot measure is constitutionally subject to disclosure requirements. In this case it makes no difference anyway.

[15]The letter provides: "Because your CTRM 'No On 71' had no source of money other than the contributions of our loyal supporters, we could not match the big money media campaign of our opponents. So we mailed campaign literature to hundred of thousands of taxpayers, telling them the truth about Proposition 71. As the campaign neared its final days, I knew that we needed to do more—but we were running out of money. And CTRM had a stack of bills which were due. So, in the closing days of the campaign, we faced a difficult decision—*raise money to pay our bills or continue the campaign.* There was no doubt in our minds what Howard Jarvis would have done—we pushed ahead. I authorized an expenditure of $90,000 to put radio commercials on the air and to continue the distribution of campaign literature. As a result of all our activities we defeated Proposition 71. But our margin of victory was only 2% of the vote! There is no question in my mind that we would not have been victorious if we had not made our extra effort." (Italics added.)

could hardly be required, on pain of civil liability, to report all future receipts and expenditures by virtue of one violation.

Again we agree with the trial judge.[16] It would be patently absurd to read sections 82013 and 84200 together to impose duties on advocacy groups such as the Movement for a single negligent violation[17] so as to allow a private "bounty hunter" to get rich off of that violation. In statutory terms, such a reading of "committee" as defined in section 82013 would contravene the plain implications of the framework laid out in sections 91004 and 91005.[18] For purposes of the reporting requirement of section 84200, committees cannot include issue advocacy groups who are retroactively assigned that status by virtue of court decision.

McCauley also argues that the trial court was obligated to find that the Movement was a "controlled committee" (controlled by Howard Jarvis, to be specific) under section 82016 and thereby obligated to report more money than just that taken in by Job 1108 (and thereby exposed to much greater civil liability). This point has been waived because McCauley has failed to set forth all the pertinent evidence. If one is going to make a "the-facts-compel-that-I-win-as-a-matter-of-law" argument, one's brief must fairly state all the evidence. (E.g., *Foreman & Clark Corp.* v. *Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362].) Here, McCauley has omitted the evidence concerning what the trial judge termed the "primary" purpose of the Movement, which was to protect Proposition 13 from court challenges. The trial judge specifically found that the Movement was not formed "primarily" for political purposes. Because McCauley has not fairly set forth all the evidence concerning the origins and purposes of the Movement, he has waived any argument based on the idea that the trial judge had no other choice but to agree with him.

---

[16]In McCauley's opening brief on cross-appeal, he devotes about a page to his argument. In his *reply* brief he devotes more than *eight* pages to the issue. While he has not run afoul of the rule that one cannot raise a new issue in a reply brief, he cannot, in light of the gross disproportionality between his treatment of the issue in the opening brief and his treatment of the issue in his reply brief, complain if we decline to address every last arguably discrete point made in the reply brief. By the same token, however, the Movement's own motion to strike portions of McCauley's reply brief which allegedly raise issues not previously raised is hereby dismissed as moot.

[17]And a violation that might not even be perceived until years later.

[18]We therefore need not bottom our holding on First Amendment concerns. However, the suggestion that even one mistake concerning what the trial judge insightfully referred to as "convoluted and complex" reporting laws made by an organization devoted to issue advocacy should expose that organization to the virtual confiscation of everything it thereafter takes in from fund-raising letters is so antithetical to free speech that it cannot go unremarked. The power to make civilly liable, like the power to tax, is the power to destroy.

## DISPOSITION

The judgment, including the award of attorney fees, is reversed. The trial court is directed to enter judgment in favor of defendants.

The issue of costs presents a small problem. In an unpublished decision, this court held that the superior court did not abuse its discretion in finding McCauley "sufficiently indigent" so as to justify the waiver of a $60,000 bond requirement under Government Code section 91012. (The prior decision is referenced in *McCauley* v. *BFC Direct Marketing* (1993) 16 Cal.App.4th 1262, 1264, fn. 1 [20 Cal.Rptr.2d 498].) In retrospect, that decision was perhaps overly generous to McCauley. However, in keeping with the spirit of that decision, we will, in the interests of justice, exercise our discretion not to impose appellate costs on McCauley. (Cal. Rules of Court, rule 26(a) ["In any case in which the interests of justice require it, the reviewing court may make any award or apportionment of costs it deems proper."].) Both sides will bear their own costs on appeal.

Wallin, J., and Crosby, J., concurred.

A petition for a rehearing was denied January 26, 1999, and respondent's petition for review by the Supreme Court was denied March 31, 1999.