Filed 1/21/21  Klein v. Hughes CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| CONRAD LEE KLEIN et al.,<br><br>Plaintiffs and Appellants,<br><br>v.<br><br>ALEXANDER HUGHES,<br><br>Defendant and Appellant. | 2d. Civ. No. B294822<br>(Super. Ct. No. BP063500)<br>(Los Angeles County) |

This appeal—the latest in a long-running series of disputes surrounding the Mark Hughes Family Trust (the Trust)—involves breach-of-trust claims related to a December 2000 settlement agreement entered into by Alexander Hughes through his mother, Suzan Hughes, in her role as his then-guardian; his former stepmother, Darcy LaPier Hughes; and the then-trustees of the Trust, Conrad Lee Klein, Christopher Pair, and Jack Reynolds (the former trustees).[1]  It presents a single,

---

[1] Klein, Pair, and Reynolds were removed as trustees in 2013.  Klein passed away in 2019.

narrow question: Did the probate court correctly conclude that Alexander's[2] breach-of-trust claims were barred by the statute of limitations set forth in Probate Code[3] section 16460? We conclude that it did, and affirm the order granting the former trustees' motion for summary adjudication.

FACTUAL AND PROCEDURAL HISTORY

Mark Hughes was the founder of Herbalife International, Inc. He formed the Trust in 1987, naming himself as sole trustee and his then-wife Suzan as successor trustee. Four limited-liability companies (LLCs) held the majority of the Trust's assets. Mark was the manager of each LLC.

Mark and Suzan had one son, Alexander, who was born in 1991. Alexander was the sole non-contingent beneficiary of the Trust and the sole income beneficiary. When Suzan filed for divorce in 1997, Mark removed her as successor trustee and replaced her with the former trustees. The former trustees were also appointed executors of Mark's estate. His will directed that any property he owned at the time of his death was to be contributed to the Trust.

Mark and Darcy married in 1999. Their prenuptial agreement provided that, upon Mark's death, Darcy would receive: (1) a lump sum payment of $10 million, payable within 45 days of Mark's demise, and (2) a "residence right" that included the use of a residence plus the payment of associated costs, which extended until Darcy either remarried or died. Separately from the prenuptial agreement, Mark gifted Darcy a

---

[2] We use the Hughes family members' first names to avoid confusion.

[3] Unlabeled statutory references are to the Probate Code.

one-percent interest in HIP Management, one of his four LLCs. The Trust could repurchase Darcy's interest upon Mark's death.

Mark died in May 2000, leaving behind an estate worth over $330 million. Upon his death, the former trustees took over as co-trustees of the Trust. In that capacity they named Klein as manager of the four LLCs. Neither he nor his co-trustees elected to exercise the option to repurchase Darcy's interest in HIP Management.

The Trust paid Darcy $10 million in June. In August the former trustees petitioned the probate court for an order clarifying the "nature and extent" of her residence right and whether that right pertained only to the Beverly Hills estate she shared with Mark, or also to the Malibu estate Mark owned. The former trustees also sought guidance regarding whether one or both of the estates could be sold.

The parties—Klein, acting on behalf of the Trust; Suzan, acting on behalf of Alexander; and Darcy, acting on her own behalf—entered mediation and reached a settlement agreement in December. The agreement provided that the Trust would pay Darcy $20 million to "satisfy all [of her] outstanding rights, entitlements[,] and claims . . . under [the] [p]renuptial [a]greement." Payments were to be made in two installments: $19 million upon approval of the settlement, and $1 million when Darcy vacated the Beverly Hills estate. In exchange, Darcy agreed to "waive[], relinquish[][,] and release[] any and all claims, rights, obligations[,] and causes of action that she may have against the . . . Trust," including those arising under her prenuptial agreement. The probate court approved the settlement in February 2001.

In May, the former trustees mailed a copy of the first accounting to Suzan in her capacity as Alexander's guardian. A schedule attached to the accounting disclosed that the Trust had made two payments to Darcy: $10 million in June 2000, and $19 million in January 2001. The former trustees sent Suzan a copy of the second accounting in December 2001. A schedule attached to that accounting disclosed that the Trust had made a third payment to Darcy—in the amount of $1 million—sometime between March and August 2001.

In March 2002, Suzan objected to the two accountings, claiming that they "lack[ed] detail and [did] not adequately disclose and explain the actions taken by the [former trustees]." She requested more information. She did not lodge any substantive objections to either accounting, however, nor did she seek affirmative relief.

In July the former trustees petitioned the probate court to approve the first and second accountings.[4] They served Suzan with copies of the accountings and petition. These documents again listed the three payments—$10 million, $19 million, and $1 million—that the Trust had made to Darcy.

Suzan objected to the petition in August, reiterating her claim that the accountings lacked adequate information. In October, the former trustees submitted additional documents, including a chart showing that Darcy owned a one-percent interest in HIP Management. The chart said that her interest was "limited to $1 million."

One year later, in October 2003, Suzan filed amended objections to the first and second accountings. These objections

_____

[4] The probate court has yet to approve these or any of the subsequent accountings.

4

included neither an objection to the December 2000 settlement agreement nor an objection to the Trust's decision not to purchase Darcy's interest in HIP Management.

The following month, Suzan filed a petition requesting that the probate court order the former trustees to purchase Darcy's interest in HIP Management. The former trustees moved for summary judgment on Suzan's petition, arguing that Darcy's interest in HIP Management had no effect on the LLC's operations. The court granted the motion, expressly denying Suzan's request to "issue orders instructing the [former trustees] . . . to buy[] out the interest of Darcy LaPier [Hughes]."

In June 2009, Suzan filed additional objections to the first through seventh accountings. These objections stated that they "replace[d] and supersede[d]" her prior objections. No objection to the December 2000 settlement agreement or to the Trust's failure to buy out Darcy's interest in HIP Management was made. Alexander joined in these objections when he turned 18 in December.

In February 2011, Alexander filed his own objections to the first and second accountings. Among his objections was that the $20 million paid to Darcy pursuant to the December 2000 settlement agreement was excessive.

Alexander filed additional objections and surcharge claims in April 2018. Included among these was an objection to the former trustees' decision not to repurchase Darcy's interest in HIP Management as part of the December 2000 settlement agreement. Alexander sought to surcharge the former trustees. He acknowledged, however, that the probate court had previously approved the settlement agreement.

5

In July, Alexander moved for summary adjudication. He claimed that the former trustees breached their fiduciary duties to the Trust by failing to: (1) disclose that they had already paid Darcy $10 million when they sought approval of the December 2000 settlement agreement, and (2) repurchase Darcy's interest in HIP Management. The former trustees brought their own motion for summary adjudication, urging the probate court to find Alexander's claims barred by section 16460's three-year statute of limitations.

The probate court denied Alexander's motion and granted the former trustees' motion. First, the undisputed evidence showed that Suzan participated in the December 2000 settlement negotiations and thus knew that Darcy was to receive a total of $20 million under the settlement agreement. Five months later she received a copy of the first accounting, which disclosed a $10 million payment to Darcy in June 2000 and a $19 million payment the following January. That disclosure was sufficient to put Suzan—and by extension, Alexander—on notice that the $10 million payment to Darcy was separate from the settlement agreement.

Second, the undisputed evidence showed that the former trustees filed and served their response to Suzan's initial objections in October 2002. This response disclosed that Darcy held a one-percent interest in HIP Management. That disclosure was sufficient to put Suzan on notice that the settlement did not include Darcy's interest in that company. Additionally, Suzan petitioned the probate court for an order forcing the former trustees to purchase Darcy's interest in HIP Management in November 2003. That reinforced that she knew that Darcy's

interest in the company had not been part of the December 2000 settlement agreement.

Finally, the undisputed evidence showed that Alexander first objected to the payments to Darcy and her retention of an interest in HIP Management in February 2011 and April 2018, respectively, well after the three-year statute of limitations imposed by section 16460 had expired.

In finding his claims barred by the statute of limitations, the probate court rejected Alexander's argument that section 1043 allowed him to raise new objections at any point before or during the hearing on the former trustees' petition to approve the accountings. The court found section 1043 to be a general procedural provision that did not displace section 16460's specific substantive provisions relating to trusts. It also found that section 1043 did not result in a waiver of a section 16460 statute-of-limitations defense when trustees petitioned to approve accounts.

DISCUSSION

Alexander contends the probate court erred when it granted the former trustees' motion for summary adjudication because section 16460 does not bar the breach-of-trust claims stemming from the December 2000 settlement agreement. We disagree.

*Summary adjudication*

A probate court properly grants a motion for summary adjudication if the moving party "show[s] that there is no triable issue as to any material fact and that [they are] entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) The moving party may meet this burden by showing that "'there is a complete defense'" to a cause of action.

7

(*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 356, italics omitted; see Code Civ. Proc., § 437c, subd. (p)(2).) "The expiration of the applicable statute of limitations is one such complete defense." (*Genisman v. Carley* (2018) 29 Cal.App.5th 45, 49.)

When reviewing an order granting a motion for summary adjudication, "we independently examine the record . . . to determine whether triable issues of fact exist to reinstate the [cause of] action." (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142.)  We view the evidence in the light most favorable to the nonmoving party, "liberally constru[ing their] evidentiary submissions and strictly scrutiniz[ing] the [movant's] own evidence." (*Ibid.*)  Any evidentiary doubts or ambiguities are resolved in favor of the nonmoving party.  (*Ibid.*)

*Section 16460*

"If a beneficiary has received an interim or final account[ing] . . . or other written report . . . that adequately discloses the existence of a claim against the trustee for breach of trust, the claim is barred as to that beneficiary unless a proceeding to assert the claim is commenced within three years [of] receipt of the account[ing] or report." (§ 16460, subd. (a)(1).)  A minor beneficiary will be deemed to have received an accounting at the time it was received by their parent or guardian.  (*Id.*, subd. (b)(3).)  An accounting adequately discloses the existence of a claim if it "provides sufficient information so that the beneficiary knows of the claim or reasonably should have inquired into the existence of the claim." (*Id.*, subd. (a)(1).)

The probate court here correctly determined that section 16460's three-year statute of limitations bars Alexander

8

from raising breach-of-trust claims related to the December 2000 settlement agreement. The first accounting disclosed that the Trust paid Darcy $10 million in June 2000 and $19 million in January 2001. The former trustees sent Suzan, in her capacity as Alexander's guardian, a copy of that accounting in May 2001. The second accounting disclosed that the Trust made a third payment of $1 million to Darcy sometime between March and August 2001. Suzan received a copy of that accounting in December. And in October 2002, following her objections to the first and second accountings, the former trustees sent Suzan a chart showing that Darcy retained a one-percent interest in HIP Management. These documents were sufficient to put Suzan on notice of any claim against the former trustees for breaches of trust related to the settlement agreement. (See, e.g., *Britton v. Girardi* (2015) 235 Cal.App.4th 721, 733; *Prakashpalan v. Engstrom, Lipscomb & Lack* (2014) 223 Cal.App.4th 1105, 1123; *Noggle v. Bank of America* (1999) 70 Cal.App.4th 853, 860, fn. 5 (*Noggle*).) Accordingly, pursuant to section 16460, those claims had to be asserted no later than October 2005. Because they were not, they are barred by the statute of limitations.

*Conflict with section 1043*

Alexander's attempts to avoid this result are not persuasive. He first argues that section 16460 is inapplicable because that section is in Division 9 of the Probate Code, which applies to accountings that have yet to be filed with the probate court. Here, however, the former trustees filed the first and second accountings with the court, which commenced a "proceeding" that subjects this case to the provisions of Division 3 of the Probate Code. (See § 1060 [Division 3 "governs all accounts to be filed with the court"].) Within Division 3 is section 1043,

9

which permits an interested person, such as a beneficiary, to object to an accounting at any point before or during the hearing on the accounting.  (§ 1043, subds. (a) & (b); see § 48 [beneficiaries are interested persons].)  Because the hearing on the first two accountings has yet to occur, Alexander claims his objections to them are still permitted.

Alexander misconstrues the procedural posture of his case.  In his briefing, Alexander attempts to frame this case around his 2011 and 2018 objections to the December 2000 settlement agreement.  But this case is about claims made against the former trustees for their alleged breaches of trust when they entered into the settlement agreement.  Those claims are *related to* Alexander's objections, but the objections themselves are not at issue here.

Alexander also misreads the applicable Probate Code provisions.  Section 1043 applies "*except* where the statute that provides for the hearing of the matter prescribes a different procedure."  (§ 1040, emphasis added.)  By requiring a claim to be brought "within three years [of] receipt of the account or report," section 16460 prescribes one such "different procedure."  The two sections are easily reconciled.

And even if they were not, we would nevertheless apply section 16460 here.  Division 3 of the Probate Code sets forth "General Provisions of a Procedural Nature."  Division 9, in contrast, sets forth the provisions specific to "Trust Law."  "When two statutes of limitations are applicable, the specific takes precedence over the general."  (*Yeh v. Tai* (2017) 18 Cal.App.5th 953, 963.)

10

*Tolling*

Alexander next argues that even if section 16460 applies, the filing of the July 2002 petition to approve the first and second accountings tolled the statute of limitations. This again misreads what the Probate Code requires.

A "proceeding to assert [a] claim" must be brought within three years of the date when an accounting discloses the existence of that claim. Alexander incorrectly asserts that the proceeding was commenced when the former trustees filed their July 2002 petition. But that makes no sense; the former trustees did not bring claims against themselves. The relevant claims were *Alexander's* claims for breach of trust that he asserted in his motion for summary adjudication. (§ 16460, subd. (a)(1) ["the claim is barred *as to that beneficiary*" (emphasis added)].)

Moreover, Alexander's argument would require us to construe the July 2002 petition as the "complaint" and his breach-of-trust claims as a "cross-complaint." (Cf. § 1000, subd. (a) [rules applicable to civil actions generally apply to probate proceedings].) But a cross-complaint can be filed only against "[a] party against whom a cause of action has been asserted." (Code Civ. Proc., § 428.10.) The petition did not assert any cause of action against Alexander.

*Relation back*

Alternatively, Alexander argues that he filed his claims within the statute of limitations imposed by section 16460 because the bases for those claims—the 2011 and 2018 objections to the first and second accountings—relate back to the objections Suzan lodged in March 2002, August 2002, and October 2003. But a claim relates back "only if it rests on the same general set of facts and refers to the same 'offending instrumentalities,'

11

accident, and injuries as the original." (*Davaloo v. State Farm Ins. Co.* (2005) 135 Cal.App.4th 409, 415; see also *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 408-409.) Nowhere in her objections did Suzan challenge the $10 million payment made to Darcy prior to the December 2000 settlement agreement or Darcy's continued ownership of a one-percent interest in HIP Management. And though Suzan requested more information from the former trustees after she received the first and second accountings, such a general request is not enough to permit Alexander to take advantage of the relation-back doctrine: "It is not enough to allege there might be as yet *undiscovered* reporting violations." (*McCauley v. Howard Jarvis Taxpayers Assn.* (1998) 68 Cal.App.4th 1255, 1258, emphasis original.)

*Issues of material fact*

Alexander next argues that even if section 16460 applies here, there were issues of material fact as to whether the documents provided to Suzan in 2001 and 2002 adequately disclosed the existence of breach-of-trust claims against the former trustees. We again disagree.

As Alexander's trustee, Suzan was aware that Darcy would receive a $10 million gift from the Trust upon Mark's death. Suzan then participated in the December 2000 settlement negotiations, and knew that Darcy would receive a $19 million payment and a $1 million payment under that agreement. When she received the first accounting a few months later, it detailed that the Trust had made two payments to Darcy, one for $10 million and one for $19 million. The second accounting then detailed that the Trust made a third, $1 million payment to Darcy. Considered together, this provided sufficient information for Suzan to know that she could bring breach-of-trust claims

12

against the former trustees for any excessive payments to Darcy. At the very least, she reasonably should have inquired into the existence of such a claim. (*Miller v. Bechtel Corp.* (1983) 33 Cal.3d 868, 874-875 (*Miller*) [trustee's role as fiduciary does not relieve beneficiary of duty to investigate]; see also *Noggle, supra*, 70 Cal.App.4th at p. 860, fn. 5; *Di Grazia v. Anderlini* (1994) 22 Cal.App.4th 1337, 1346.)

The same is true with respect to Darcy's interest in HIP Management. In October 2002, after Suzan objected to the petition to approve the first and second accountings, the former trustees provided her with a chart detailing the relationship of the various LLCs owned by the Trust. That chart showed that Darcy owned a one-percent interest in HIP Management. Suzan confirmed that she knew of this interest the following year when she petitioned the probate court to order the former trustees to exercise the Trust's option to purchase it. Given this knowledge, it was Suzan's duty to inquire into the existence of any breach-of-trust claim based on the former trustees' failure to purchase Darcy's interest. (*Miller, supra*, 33 Cal.3d at pp. 874-875.)

*Graham-Sult v. Clainos* (9th Cir. 2013) 756 F.3d 724, on which Alexander relies, is not to the contrary. In that case, the duty to investigate was not triggered because the trustee did not provide the beneficiaries with the assignment of intellectual property at issue. (*Id.* at p. 744.) Here, in contrast, the undisputed evidence showed that the first and second accountings detailed the three payments made to Darcy. It also showed that the trustees provided Suzan with a chart delineating Darcy's interest in HIP Management. Thus, unlike the beneficiaries in *Graham-Sult*, Suzan knew of facts sufficient to trigger her duty, as Alexander's guardian, to inquire into the

13

existence of any breach-of-trust claim related to the December 2000 settlement agreement.

*Absurdity*

Finally, Alexander argues that applying section 16460 here will lead to absurd results, including "turn[ing] the Probate Code on its head" by requiring a beneficiary to establish the accuracy of an account. (See, e.g., *Estate of McLaughlin* (1954) 43 Cal.2d 462, 465-466 [trustee, not beneficiary, bears burden of showing accuracy of an accounting].) But this case does not stem from claims related to a petition to settle an account pursuant to section 17200; it stems from the claims set forth in dueling motions for summary adjudication, neither of which sought to settle any of the Trust accountings. Alexander implicitly acknowledges as much, noting in his briefs that *all* of the Trust accountings have yet to be approved. The trustees will still bear the burden of proving their accuracy whenever they are settled.

We also reject Alexander's assertion that applying section 16460 here will "bypass[] the probate court's supervisory and protective role." The cases on which Alexander relies to support this assertion discuss the court's role when a petition to settle an account is filed. (See, e.g., *Schwartz v. Labow* (2008) 164 Cal.App.4th 417, 427.) Again, however, this case deals with the claims set forth in motions for summary adjudication, not a section 17200 petition. And even if the court's section 17200 supervisory powers were triggered, the court was required to "exercise those powers 'within the procedural framework laid out in the governing statutes' of the Probate Code." (*Babbitt v. Superior Court* (2016) 246 Cal.App.4th 1135, 1144.) Section 16460 is one of the governing statutes that lays out that

14

procedural framework.  The probate court correctly applied it when it granted the former trustees' motion for summary adjudication.

DISPOSITION

The probate court's order granting the former trustees' motion for summary adjudication, entered December 20, 2018, is affirmed.  The former trustees shall recover their costs on appeal.

<u>NOT TO BE PUBLISHED.</u>


TANGEMAN, J.


We concur:


YEGAN, Acting P. J.


PERREN, J.

David J. Cowan, Judge

Superior Court County of Los Angeles

_____

Greenberg Traurig, Eric V. Rowen, Scott D. Bertzyk and Lisa C. McCurdy for Defendant and Appellant.

Loeb & Loeb, Oleg Stolyar and Donald A. Miller for Plaintiffs and Appellants.